In re:

LEE WAY HOLDING COMPANY

§
§
§
§

CASE NO: 85-00661

DEBTOR

_____/

## MOTION FOR ORDER RELEASING UNCLAIMED FUNDS

OMEGA CONSULTING, in its capacity as ASSIGNEE of LEE WAY HOLDING COMPANY, respectfully requests this Court, pursuant to 11 U.S.C. § 347(b) and 1143, enter an order directing that the remaining unclaimed funds in the registry account, which funds are believed to be $195,627.60, be paid to Assignee, (the "Motion") and in support thereof, states as follows:

Factual Background

1.     Lee Way Holding Company, assigned the rights and privileges to recover unclaimed assets to Omega Consulting, via an instrument entitled "Assignment To Recover Assets" executed by said corporation's duly authorized representative, WILLIAM C. BUCKHAM, in his capacity as the corporation's last General Counsel and one of its last Directors, which assignment instrument was executed before a notary public for the state of Georgia for the county of Gwinnett on February 4, 2008, and then forwarded to Omega Consulting by United States Postal Service regular mail.  The original assignment is being filed as an exhibit with this motion.  (See Exhibit "A")

2.     On February 27, 1985, LEE WAY HOLDING COMPANY was established as a business entity incorporated in the state of Ohio.

3. On March 7, 1985 (the "Petition Date"), a Chapter 11 bankruptcy petition was VOLUNTARILY filed.

4. A chapter 11 plan was confirmed on October 5, 1993 and the case was closed on or about August 13, 1998. The Chapter 11 amended plan of reorganization was filed on or about July 13, 1993, and it does not contain any provision dealing with unclaimed dividends.

5. This Court is asked to take judicial notice that a Chapter 11 bankruptcy case closes only after administration of its plan and fulfillment of the trustee of his/her duties. In this instance, more than five (5) years have elapsed since the case closed.

6. The docket report shows that on or about July 10, 1998, unclaimed dividends totaling $241,504.66 were turned over to the Court. Since that time, there have been various motions filed to return such funds. Applicant believes that after deducting the total of unclaimed funds applications that have been paid, then there is an amount totaling between $140,000 to $195,627.60 remaining in the Court's registry. The actual amount of unclaimed funds that are determined to be in the registry account should be returned to Applicant pursuant to the mandatory provisions of 11 U.S.C. § 347(b) and 1143.

## Applicants's Rights

7. Ohio Secretary of State corporation records show that Lee Way Holding Company was created as a result of a corporate merger between Lee Way Motor Freight, Inc and CL Motor Freight, Inc on or about February 27, 1985. William Buckham is conspicuosly designated as the Secretary of CL Motor Freight, Inc. who executed the merger agreement. (See Exhibit "F"). Mr. Buckham is also recognized in official court memorandum and orders as the vice-President and General Counsel of Commercial Lovelace Motor Freight, Inc. (See Exhibit "G" and "H"). Ohio corporate records affirmatively show Mr. Buckham holding a variety of

executive positions with Commercial Lovelace since at least 1976. (See Exhibit "I"). Pursuant to authority provided by Ohio statutes and general practice and procedure in the bankruptcy courts, all rights and privileges in recovering these unclaimed assets have been assigned to Omega Consulting. (See Exhibit "A")

8.     The Court is expressly asked to take judicial notice that United District Courts for both the Southern and Northern District of Ohio recognize the fundamental principle of law that Ohio corporation statutes provide that an administratively dissolved corporation continues to exist for the purpose of winding up its affairs. See <u>Shaw vs. Jenkins</u>, 159 F. Supp. 2d 995 (S.D. Ohio 2001), See also <u>Eleanore Bld'r, Inc. vs. United States</u>, 826 F. Supp. 1111, 1115 (N.D. Ohio 1993).  This fundamental concept of law is succinctly declared by one commentator as follows: "After Liquidation, any dissolution of the corporation or partnership that the parties desire must be effectuated under state law, since the Code does not provide for dissolution of corporations or partnerships." See 6 Collier on Bankruptcy, ¶ 727.01[c](15th ed. Rev. 2000)

9.     Applicant asks the Court to take judicial notice that corporations are creations of state law, and Ohio corporations statutes and law unequivocally demonstrate the continued existence of administratively dissolved corporation, and the attendant authority and power of such corporation's directors and officers to act on behalf of a corporation in matters germane to winding up of the corporation's affairs.

10.     Omega Consulting is the Assignee of the Debtor via a duly executed assignment by the corporation's General Counsel and Director and is legally entitled to recover these funds under Bankruptcy Code, Section 2042 and based in equity and law as discussed in <u>In re Atkins</u>, (M.D. Fla. 2005), and <u>In re Georgian Villa, Inc.</u>, 55 F.3d 1561, 1563 (11th Cir. 1995).

11.     Applicant would show that LEE WAY HOLDING COMPANY, is an Ohio Corporation, and under Ohio corporation statutes, it continues to exist for the purpose of winding up its incidental affairs, including gathering any remaining assets.

12.     Applicant asks the Court to take judicial notice of the myriad of court decisions by bankruptcy courts recognizing the authority of former corporate officers to wind up the affairs of incidental matters in bankruptcy court, and to recognize that Applicant is legally entitled to recover these funds under Bankruptcy Code Section 2042 and based in equity and law as discussed in In re Atkins, (M.D. Fla. 2005), and In re Georgian Villa, Inc., 55 F.3d 1561, 1563 (11th Cir. 1995).

## Relief Requested

13.     Bankruptcy Code sections 347(b) and 1143 govern the distribution of unclaimed funds. Pursuant to 11 U.S.C. § 347(b) any security, money, or property remaining unclaimed at the expiration of the time allowed in a case under chapter 9, 11, or 12 of this title for the presentation of a security or the performance of any other act as a condition to participation in the distribution under any plan confirmed under section 943(b), 1129, 1173, or 1225 of this title, as the case may be, becomes the property of the debtor or of the entity acquiring the assets of the debtor under the plan, as the case may be.

14.     Furthermore, 11 U.S.C. § 1143 provides that if a plan requires presentment or surrender of a security or the performance of any other act as a condition to participation in distribution under the plan, such action shall be taken later than five years after the date of the entry of the order of confirmation.  An entity that has not within such time presented or surrendered such entity's security or taken any such other action that the plan requires may not participate in distribution under the plan.

15. "Sections 347(b) and 1143 together establish an outer limit of five years from entry of a plan confirmation order within which a creditor required to perform an act as a condition of participating in a plan distribution must accomplish the act or relinquish its rights right to participate." In re TLI, Inc., 213 B.R. 946, 950 (N.D. Tex. 1997). Presenting one's self and cashing a check has been held to be performance of an act as a condition to participation. See In re Rodman, Inc., 50 B.R. 313, 314 (Bankr. W.D. Okla. 1985); In re TLI, 213 B.R. at 956 but see In re Goldblatt Bros., Inc., 132 B.R. 736 (Bank. N.D. Ill. 1991); In re The Signature Group, 172 B.R. 501 (Bankr. R.I. 1994); In re IBIS Corporation, 272 B.R. 883 (Bankr. E.D. Va. 2001). More than f ve years have passed since confirmation of the Plan and the creditors have failed to claim the unclaimed funds. Therefore, the unclaimed funds have become property of Applicant, Omega Consulting, as a result of the assignment of interest from the Debtor's Sole Shareholder.

16. Based upon Bankruptcy Code Sections 347(b) and 1143, the Debtor, by and through its Assignee, requests the unclaimed funds remaining in the registry account be paid to LEE WAY HOLDING COMPANY c/o Omega Consulting..

17. Applicant has made sufficient inquiry and has no knowledge that this claim has been previously paid that any other application for this claim is currently pending before this Court, or that any party other than the Applicant is entitled to submit an application for the payment of this claim.

18. Further bankruptcy jurisprudence indicates that a plan may not be revisited for modification and/or changes after it has been substantially consummated. The plan in this bankruptcy proceeding has been substantially modified.

19.    Applicant asks the Court to take judicial notice of all the supporting exhibits that have already been filed.

20.    I understand that, pursuant to 18 U.S.C. § 152, I may be fined or imprisoned, or both, if I have knowingly and fraudulently made any false statements in this document.

## DECLARATION UNDER 28 U.S.C. § 1746

"I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct

> LEE WAY HOLDING COMPANY, by and through its duly authorized Assignee, OMEGA CONSULTING
>
> By: _____ 2-9-08
> Eric Dangerfield, Owner
> 7706 Pinebrook Drive
> San Antonio, Texas 78230
> Tel: (210) 430-0649
> Fax: (206) 888-4687

## 28 U.S.C. § 1746

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date). (Signature)".
(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date). (Signature)".

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**In re:**

**LEE WAY HOLDING COMPANY** §

§     **CASE NO: 85-00661**

§

**DEBTOR** §

§

_____/

## CERTIFICATE OF SERVICE

I certify under penalty of perjury under the law of the United States that on 2-9-08 _____, 2008, that I mailed a copy of the "Motion For Order Releasing Unclaimed Funds" to the United States Attorney For The Southern District Of Ohio at 303 Marconi Boulevard, Suite 200; Columbus, OH 43215, to the United States Trustee at 170 N. High Street, Ste 200; Columbus, OH 43215-2403, and to William Buckham; 103 Oakland Hills Court; Johns Creek, GA 30097.


Eric Dangerfield, on behalf of Omega Consulting,
as Assignee of LEE WAY HOLDING COMPANY

# EXHIBIT "A"

# ASSIGNMENT TO RECOVER CASH ASSETS

1. LEE WAY HOLDING COMPANY, hereinafter referred to "ASSIGNOR", by and through the undersigned in his capacity as the company's last General Counsel and as one of its last Directors, and pursuant to his powers thereto, if any, and for valuable consideration or the promise of valuable consideration totaling $93,800, and does hereby assign to Omega Consulting; 7706 Pinebrook Drive; San Antonio, Tx 78230; Phone-(210) 430-0649; Fax-(206) 888-4687; all the rights, duties, privileges, and interests to recover certain identified cash assets, receivables, choses in action, tangible and/or intangible property totaling $140,000 or more in which Assignor appears to have a direct interest, and appoints Omega Consulting, Assignee regarding recovery of the same. *Omega will return thirty- three percent (33%) of the funds recovered and remit the balance to William C. Buckham on behalf of Assignor. WCB*

2. THIS ASSIGNMENT is on an "As Is", and Assignee shall not incur any expense or obligation on Assignor's expense, and this assignment is only valid to the extent that neither Assignor, nor its agents are engaged in any effort to recover the cash assets.

3. ASSIGNEE shall prosecute this matter pursuant in its name, and subject to its sole discretion, and the rights, privileges, interests, powers, and authority assigned herein shall commence and be in full force and effect from the date of signature hereunder.

4. IT IS UNDERSTOOD that a photocopy, facsimile, or email of this Assignment shall have the same authority and effect as the original.

WHEREFORE, I set my hand as follows:

SIGNED: _____

WILLIAM C. BUCKHAM, as last known General Counsel and
as one of the last known Directors of Lee Way Holding Company,
4411 E. Jones Bridge Rd
Norcross, GA 30092

## NOTARY ACKNOWLEDGMENT

BEFORE ME, in the County of _Gwinnett_ in the State of _Georgia_ appeared _WILLIAM C. BUCKHAM_, and provided a valid photo identification and executed this instrument in the capacity stated herein. WITNESS my hand and official seal.

Date: _February 4, 2008_  _____
Notary Public
My Commission Expires: _September 7, 2010_

February 4, 2008

Omega Consulting
Attn: Eric Dangerfield
7706 Pinebrook Drive
San Antonio, TX 78230

Dear Mr. Dangerfield:

Further to your communication regarding cash assets that appear to be recoverable by
Lee Way Holding Company ("Lee Way"), a duly signed Assignment to Recover Cash
Assets form is enclosed.

I have executed the Assignment solely in my capacity as the company's last General
Counsel and as one of its last Directors. It is my understanding that you will proceed
based on this assignment, with all costs and expenses to be borne solely by Omega
Consulting. It is my further understanding that Omega will retain thirty-three percent
(33%) of what is recovered from the Lee Way estate and remit the balance to me.

If you have identified the whereabouts of any other Lee Way Corporate officers and/or
directors, please so advise. In any event, please update me on the recovery effort within
the next 2 weeks.

Best regards,

William C. Buckham
103 Oakland Hills Court
Johns Creek, GA 30097
bbuckham@checkfree.com
678.375.3761 (O)
678.481.6649 (C)

Burt Moore

**CheckFree**

CheckFree Corporation
4411 East Jones Bridge Road
Norcross, Ga 30092

NORCROSS GA 300

18 JAN 2002 PM 3 T

Omega Consulting
7706 Pinebrook Drive
San Antonio, TX 78230

# EXHIBIT "B"

EXHIBIT "C"

Google

william buckham + checkfree

| Search | Advanced Search
Preferences

---

**Web**        Results **1 - 10** of about **509** for **william buckham + checkfree**. (**0.05** seconds)

Tip: Save time by hitting the return key instead of clicking on "search"

**EDGAR Online**
Person. **WILLIAM** C. **BUCKHAM** ... **CHECKFREE** CORP \GA\, S-4, 10/31/1996.
CORILLIAN CORP, S-1, 1/27/2000. PROVIDENT RIVERFRONT FUNDS, PRES14A,
11/12/1996 ...
google.brand.edgar-online.com/PeopleFilingResults.aspx?PersonID=2169242 - 50k -
Cached - Similar pages

**Sample Contracts - Electronic Commerce Service Agreement ...**
**CheckFree** agrees to implement the electronic commerce system for Client in ..... Ohio
43235 Attention: **William** C. **Buckham**, Assistant General Counsel Atlanta ...
contracts.onecle.com/netbank/**checkfree**-services-1997-10-30.shtml - 91k -
Cached - Similar pages

**Sample Contracts - Electronic Commerce Service Agreement ...**
**CheckFree** Services Corporation. 4411 East Jones Bridge Road. Norcross, GA 30092.
Attention: **William** C. **Buckham**, Assistant General Counsel ...
contracts.onecle.com/digital-insight/**checkfree**.svc.2004.09.08.shtml - 194k -
Cached - Similar pages

**SEC Info - Checkfree Corp/GA - 10-K - For 6/30/02 - EX-10.J**
88 East Broad Street Columbus, Ohio 43215 As to **CheckFree William** C. **Buckham** Vice
President and Assistant General Counsel **CheckFree** Corporation 6000 ...
www.secinfo.com/dsVS7.37Zg.d.htm - 42k - Cached - Similar pages

**SEC Info - Checkfree Corp/GA - 10-Q - For 3/31/96 - EX-10.F**
Document/Exhibit Description Pages Size 1: 10-Q **Checkfree** Corporation ..... OH 43235
Attention: **William** C. **Buckham**, Vice President of Administration and ...
www.secinfo.com/dsVS7.92a4.7.htm - 70k - Cached - Similar pages
More results from www.secinfo.com »

**Business Contacts from Bs-Bu in Jigsaw's Business Directory**
Bill **Buckham** - **CheckFree** Corporation · Mike Buckhaulter - ABT Internation Corporation ...
Duane **Williams Buckingham** - INNCOM International Inc. ...
www.jigsaw.com/Bs-Bu/4/contact_information.xhtml - 53k - Cached - Similar pages

**CHECKFREE** CORP \GA\ - CKFR Quarterly Report (10-Q) EXHIBIT 10.F
**Checkfree** Corporation 8275 North High Street Columbus, OH 43235 Attention: **William** C.
**Buckham**, Vice President of Administration and General Counsel ...
sec.edgar-online.com/1996/05/14/00/0000950152-96-002379/Section17.asp - 58k -
Cached - Similar pages

**Royals 'good value' for money, says Buckingham Palace**
... Family is a 'good value' for Britain, said **Buckingham** Palace on Wednesday. ... banking
service provider **CheckFree** Corp. is rolling out technology that ...
www.cbc.ca/world/story/2005/06/22/royalfamily-value050622.html - 31k -
Cached - Similar pages

### Bank of America takes stake in **CheckFree** | Tech News on ZDNet

Bank of America will take out a 16 percent stake in **CheckFree** Holdings Corp. as part of ...
Avaya CIO: Lorie **Buckingham** · View all CIO Vision Series Videos ...
news.zdnet.com/2100-9595_22-520239.html - 42k - Cached - Similar pages

### Electronic Frontier Foundation Resources on TechRepublic

**CheckFree's** range of services and products are focused on enabling customers to make ...
Avaya CIO: Lorie **Buckingham** · View all CIO Vision Series Videos ...
search.techrepublic.com.com/search/Electronic+Frontier+Foundation.html - 51k -
Cached - Similar pages

**1** 2 3 4 5 6 7 8 9 10    **Next**

william buckham + checkfree    [ Search ]

Search within results | Language Tools | Search Tips | Dissatisfied? Help us improve | Try Google Experimental

©2008 Google - Google Home - Advertising Programs - Business Solutions - About Google

# EXHIBIT "D"

# Checkfree Corp/GA · 10-K · For 6/30/02 · EX-10.J

### Filed On 9/25/02 7:05pm ET   ·   SEC File 0-26802   ·   Accession Number 950152-2-7199

|Find|     in this filing.     Show docs searched   and   every "hit".
Help..,    *Wildcards:* ? (any letter). * (many). *Logic:* for Docs: & (and). | (or). for Text: | (anywhere). "(&)" (near).

| As Of | Filer | Filing | As/For/On Docs:Pgs | Issuer | Agent |
|--------|--------|--------|--------|--------|--------|
| 9/26/02 | Checkfree Corp/GA | 10-K | 6/30/02   9:104 | | Bowne of Cleveland/FA |

---

### Annual Report · Form 10-K
### Filing Table of Contents

| Document/Exhibit | Description | Pages | Size |
|---|---|---|---|
| 1: 10-K | Checkfree Corporation 10-K | 33 | 182K |
| **2: EX-10.J** | **Material Contract** | **7** | **39K** |
| 3: EX-13 | Annual or Quarterly Report to Security Holders | 56 | 396K |
| 4: EX-21 | Subsidiaries of the Registrant | 1 | 6K |
| 5: EX-23 | Consent of Experts or Counsel | 1 | 7K |
| 6: EX-24 | Power of Attorney | 1 | 7K |
| 7: EX-99.A | Miscellaneous Exhibit | 2t | 11K |
| 8: EX-99.B | Miscellaneous Exhibit | 1 | 7K |
| 9: EX-99.C | Miscellaneous Exhibit | 1 | 7K |

---

### EX-10.J · Material Contract

X See Page 7

EXHIBIT 10(j)

## ACH OPERATIONS AGREEMENT

In consideration of the mutual promises and obligations set forth herein, CHECKFREE CORPORATION ("*CheckFree*") and KEYBANK NATIONAL ASSOCIATION ("*KeyBank*") hereby agree to be bound by the terms and conditions set forth in this ACH Operations Agreement ("*Agreement*") as follows:

### 1.    SERVICES, FEES, CHARGES, AND VOLUME.

(a) KeyBank will assign to CheckFree the Federal Reserve transit routing numbers ("*Transit Number*") as defined in Exhibit B for automated clearing house ("*ACH*") settlement or clearing originations. Such Transit Numbers will be used by CheckFree only for ACH originations in accordance with the terms of this Agreement. KeyBank will notify the Federal Reserve Bank of Cleveland ("*Federal Reserve Bank*") to accept the Transmissions (defined under Section 2(a)) submitted by CheckFree using such Transit Numbers. "*Services*" hereunder shall mean the provision by KeyBank to CheckFree of the use of the Transit Numbers and of access with respect to the Transmissions to the ACH processing, clearing, and settlement capability offered by the Federal Reserve Bank to KeyBank through KeyBank's account at the Federal Reserve Bank. "*Services*" shall also include any other services defined as "*Services*" in any schedule to this Agreement signed by the parties and expressly referencing this Agreement and the inclusion of such services as part of the Services.

(b) CheckFree shall pay to KeyBank for the Services such fees ("*Fees*") as are specified in Exhibit A. CheckFree shall also pay to KeyBank any charges assessed by the Federal Reserve Bank for or in connection with the Services. KeyBank may increase the Fees effective as of each succeeding anniversary date following April 1, 1999, by an amount not to exceed the percentage increase in the Consumer Price Index during the one-year period immediately prior to the applicable anniversary date.

### 2.    ACH MAGNETIC TAPE/TRANSMISSION.

(a) CheckFree shall format daily a transmission ("*Transmission*") consisting of ACH debit and credit entries in a form prescribed by the Operating Rules of the National Automated Clearing House Association ("*NACHA Rules*") using thereon the Transit Numbers as set forth in Section 1(a) and forward it directly to the Federal Reserve Bank or its regional processing center. CheckFree shall forward a duplicate of the Transmission to KeyBank at the same time that it sends the Transmission to the Federal Reserve Bank which KeyBank may use for internal monitoring purposes. In connection with the Transmissions, CheckFree shall use an encrypted communications line with access controls acceptable to KeyBank and will employ those security procedures identified as "*Level One Security Procedures*" offered by the Federal Reserve Bank for the purpose of verifying the authenticity of the source of the Transmission. In such and in all other respects, CheckFree agrees to abide by the terms of Operating Letter No. 13 of the Federal Reserve Bank entitled "*Automated Clearing House Items*" and its appendices, as amended from time to time, or any successor operating letter covering ACH transactions, and shall notify the Federal Reserve Bank of such facts in the manner prescribed by it. The preparation and transfer of Transmission to the Federal Reserve Bank, the processing of the Transmissions by the Federal Reserve Bank or by CheckFree, including any processing involving the forwarding, correcting, reversal, or rejection of a Transmission or any debit or credit entry contained therein or any part thereof, and any conduct in connection with or in relation to such preparation, transfer, and processing, shall be defined hereunder as the "*Operations*".

(b) KeyBank has the right at any time to require, CheckFree to immediately provide sufficient funds in the amount of each ACH credit entry contained in any Transmission sent to the Federal Reserve Bank. Failure to provide sufficient funds by 5:00 p.m. EST on settlement date, will result in the immediate termination of this Agreement.

### 3.    COMPLIANCE.

KeyBank and CheckFree understand, acknowledge, and agree that this Agreement is subject to the ongoing approval of the Office of the Comptroller of the Currency, the Federal Reserve Bank, and the Federal Reserve

Board, including but not limited to the ability of KeyBank to retain multiple routing and transit numbers. Should the Federal Reserve Bank or any other regulatory agency direct KeyBank to cease and desist such operations, refuse to continue to permit KeyBank to provide the Services to CheckFree, or change the method of operations involving the CheckFree Service, or should KeyBank's provision of the Services or any part hereof be or become in violation of any law, regulation, circular, or official interpretation or letter of a regulatory agency, then KeyBank will not be, required to continue providing the affected Service but will promptly notify CheckFree and that the services contemplated herein will be terminated. However, KeyBank will use reasonable efforts to attempt to assist CheckFree in determining alternative processing scenarios provided that KeyBank reserves the right to negotiate the price with respect to any such alternative servicing arrangements. CheckFree agrees that it willfully comply with all applicable state and federal laws, regulations, and Federal Reserve Bank operating letters, including but not limited to Federal Reserve Board Regulation E, Federal Reserve Bank Operating Letter No. 13 or other successor operating letter, and with the NACHA Rules as such laws, regulations, operating letters, and NACHA Rules are amended from time to time and CheckFree acknowledges that such amendments may necessitate a change in KeyBank's pricing. Insofar as KeyBank's cooperation is necessary to enable CheckFree to comply with the foregoing, KeyBank will reasonably cooperate with CheckFree. In addition, KeyBank and CheckFree agree that if the NACHA Rules require any change in operations involving the processing of Transmissions, CheckFree will cooperate to comply with same. Notwithstanding any provision of this Agreement the terms of this Agreement shall supersede any conflicting NACHA Rules.

### 4.  TERM OF AGREEMENT.

(a) This Agreement will become effective on the Effective Date and will continue for a three-year period (the "*Initial Term*") unless renewed for one, or more additional two-year terms (each a "*Renewal Term*") and any one or more additional ,successive biennial anniversary dates thereof (each a "*Renewal Date*") pursuant to Section 4(b) and (c) below. The renewal period shall commence on the expiration date of the Initial Term in accordance with the terms and conditions of this agreement and at fees to be agreed upon at such time of renewal.

(b) If either party does not wish to renew this Agreement for a Renewal Term, it must give written notice to the other party of such intent by no later that 120 days prior to the next Renewal Date and the Agreement will thereupon terminate upon such Renewal Date. If such notice is not given by either party, this Agreement will renew automatically for a Renewal Term upon such Renewal Date. If either party intends to renew this Agreement with modifications for a Renewal Term, it shall submit to the other party by no later than 120 days prior to the next succeeding Renewal Date modified Agreement containing proposed terms and conditions.

(c) Where a modified Agreement is submitted to a party pursuant to Section 4(b), such party will notify the submitter in writing of its selection, not later than ninety (90) days prior to the next succeeding Renewal Date of one of the following alternatives:

(i) The modified Agreement is acceptable and it will be signed at least sixty (60) days prior to the applicable Renewal Date.

or

(ii) Such party requests renegotiation of certain terms and conditions of the modified Agreement. Such requests will identify the provisions to be negotiated and suggest modifications acceptable to such party. In the event such party elects this alternative, both parties reserve the right to not renew the Agreement in its original form or with modifications proposed by either party and the Agreement will terminate automatically on the Renewal Date unless anew agreement in writing is executed by both parties.

or

(iii) Such party intends to terminate the Agreement, in which case the Agreement will terminate automatically on the applicable Renewal Date.

2

(d) In the event that either party has submitted a modified Agreement and the receiving party fails to notify the submitting party of a selection under Section 4(c), the receiving party shall be conclusively presumed to have accepted this modified Agreement, and the receiving party will execute the same no less than (60) days prior to the Renewal Date.

5. **AGREEMENT TERMINATION.**

In addition to the termination procedure set forth in Section 4:

(a) Either KeyBank or CheckFree may terminate this Agreement upon material breach of any provision hereof by the other party hereto, which shall expressly include the failure of CheckFree to pay any fee or charge when due, upon giving such other party (30) days prior written notice of its intention to terminate and its reason therefor. Either KeyBank or CheckFree will, with any such notice, to the other party, indicate that such other party has thirty (30) days within which to remedy the breach and if it is remedied by such other party within such period, this Agreement will continue as though no such notice had been sent.

(b) Either KeyBank or CheckFree may terminate this Agreement, upon giving the other party hereto one hundred twenty (120) days prior written notice of its intention to terminate, on or after acquisition, directly or indirectly, whether through ownership of stock or through any other means whatsoever, of effective or working control of the other party hereof, or its operations or policies, by any corporation, trust association or similar corporation if following such acquisition, failure to terminate this Agreement would, in the opinion of counsel acceptable to the other party, give rise to a violation of one or more provisions of the Sherman Act (15 U.S.C. ss.1 et seq.) or the Clayton Act (15 U.S.C. ss.18 et seq.)

(c) Either KeyBank or CheckFree may terminate this Agreement immediately by giving the other party written notice if such other party becomes insolvent, is unable to generally pay its debts as they become due, files or has filed against it or its assets a petition or proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors rights, whether in a United States Bankruptcy Court or other court, or a petition is presented for the winding up or liquidation of a party, or a receiver, trustee, conservator, administrator, custodian, or other similar official is appointed for its assets pursuant to a state or federal court proceeding.

(d) Either KeyBank or CheckFree may terminate this Agreement upon written notice to the other party in the event either party is required to discontinue its participation in the Services based upon (i) a change in the rules, regulations, or letters of any regulatory body, including the Federal Reserve Bank or other reserve bank, the NACHA Rules, or any laws governing or applicable to the Services that makes either party unable to continue to make Transmissions or render Services hereunder, or (ii) an order of a state or federal court or regulatory body having jurisdiction to require either CheckFree or KeyBank to terminate Transmissions or Services hereunder.

(e) KeyBank may terminate the agreement immediately if CheckFree does not provide sufficient funds as indicated in section 2(b).

6. **CONTINUED PROCESSING.**

In the event of termination of this Agreement, KeyBank may continue, if it so elects, to perform the Service for CheckFree, KeyBank will establish charges and costs for such continuing processing and will notify CheckFree, of the amount thereof prior to performing the Services.

7. **CONTINUED PROCESSING.**

All obligations of either party incurred or existing under this Agreement as of the time of any termination hereof will survive such termination.

3

8. **ASSIGNMENT.**

The rights, duties, and obligations of KeyBank and CheckFree pursuant to this Agreement shall not be assigned or otherwise transferred in any way without the prior written consent of the other party, provided that neither party will unreasonably withhold such consent.

9. **REGULATION AND EXAMINATION.**

KeyBank and CheckFree understand and agree that the performance of obligations under this Agreement is subject, without notice, to the regulation and examination of the Comptroller of the Currency, the Federal Reserve Board, or such other governmental agency as shall have jurisdiction over the subject matter hereof.

10. **CONFIDENTIALITY.**

(a) KeyBank will safeguard, and hold confidential from disclosure to unauthorized persons, all data of CheckFree to which KeyBank or one of its affiliates obtains access pursuant to this Agreement to the same extent that KeyBank safeguards data relating to its own business, unless such data are otherwise available to the public or are already in KeyBank's possession and were rightfully obtained by it from others, or unless such disclosure is required by law or regulation. In such case, KeyBank will bear no responsibility for disclosures thereof or with respect thereto, whether inadvertent or otherwise. KeyBank's obligations herein shall be perpetual and shall survive and continue after termination.

(b) CheckFree will safeguard, and hold confidential from disclosure, to unauthorized persons, all data owned or licensed by KeyBank or one of its affiliates to which CheckFree obtains access pursuant to this Agreement to the same extent that CheckFree safeguards data relating to its own business, unless such data are otherwise available to the public or are already in CheckFree's possession and were rightfully obtained by it from others, or unless required by law or regulation. CheckFree's obligations herein shall be perpetual and shall survive and continue after termination.

11. **DUE CARE.**

(a) KeyBank and CheckFree will exercise due care in performing their respective obligations hereunder and each party will, in the, event of an error or omission attributable to the malfunction of equipment which it owns or leases or to the acts, negligence, or the failure of operators, programmers, or other personnel or programs employed by them, which error or omission impedes the performance of such party's obligations hereunder, use reasonable efforts to correct such error or omission, and provide prompt notice of the error or omission to the other party.

(b) Neither party shall be liable to the other for any nonperformance if it is prevented from performing any task hereunder in whole or in part as a result of an act of God, war, civil disturbance, labor dispute, or other cause beyond its reasonable control, provided, that is has taken reasonable steps and precautions to minimize the delay caused by such event and its commences performance as soon as reasonably possible after the occurrence.

12. **INDEMNIFICATION.**

(a) CheckFree will at all times indemnify, protect, and hold harmless KeyBank and its officer, employees, affiliates, and assigns (each an "*Indemnified Party*") from and against any and all loss, liability, claims, demands, or disputes, together with all costs, charges, and expenses, including counsel fees and litigation expenses, imposed upon or on any manner accruing against KeyBank or its assigns, arising out of or in any way related to the Services or Operations or KeyBank's performance of its obligations under this Agreement.

(b) CheckFree will, at its own expense and if KeyBank so requests, defend any action or preceding brought against an Indemnified Party, in connection with any such liability, claim, demand, or dispute.

4

(c) These provisions will not be applicable in the case of such liability, claim, demand, or dispute arising solely out of KeyBank's negligence or breach of its obligations to CheckFree under this Agreement.

### 13. WARRANTIES.

Each delivery of a Transmission, and each communication of instructions to KeyBank or the Federal Reserve Bank in connection with the Services, Operations, or performance of this Agreement by CheckFree, shall constitute a warranty by CheckFree to KeyBank:

(a) that the Transmission and all ACH entries therein (i) are in the correct form and contain correction information, (ii) are timely under the terms and provisions of Operating Letter 13 and this Agreement, (iii) with respect to ACH debit entries, are for sums due and owing from accounts debited, and (iv) with respect to ACH credit entries are for sums appropriately due to accounts credited; and

(b) that the creation and processing of each ACH entry and error correction, and the action of KeyBank or the Federal Reserve Bank in accordance with any instruction from CheckFree, is fully authorized by CheckFree, the party to whom such ACH entry relates, and any other party whose authorization is required.

### 14. INSPECTION AND AUDIT.

CheckFree shall permit KeyBank or KeyBank's designee at any reasonable time, with prior notice and at KeyBank's expense, to conduct an inspection or audit of CheckFree's records and materials relative to the Services, Operations, and of CheckFree's accounting or auditing procedures regarding the Services and Operations. In addition, CheckFree will furnish to KeyBank on a quarterly basis, a financial statement of CheckFree which has been completed based upon generally accepted accounting principles. If KeyBank as a result of such inspection, audit or review, reasonably concludes that it is exposed to undue financial risk or exposure based on the internal controls and security procedures of CheckFree, KeyBank shall notify CheckFree in writing of such finding and CheckFree shall remedy such condition within a time frame agreed upon by the parties or, if the parties cannot agree, within such time as is reasonable considering the risk or exposure and the cost of controls.

### 15. INSURANCE.

KeyBank and CheckFree shall at all times during the term of this Agreement maintain data media insurance to cover the replacement of lost or damaged storage media and business interruption insurance to cover the expense of reconstruction of lost data or files.

### 16. LIMITATION ON DAMAGES.

In any action by one of the parties against the other arising from performance, or the failure of performance, of the provisions of this Agreement, damages will be limited to general money damages in an amount not to exceed the actual damages of the party, and reasonable attorneys' fees and other expenses of litigation. In no case will a party be responsible for special, incidental, consequential, or exemplary damages, except for willful breach of this Agreement or where such damages are part of a claim for indemnification from liability under Section 12 as damages sought or recovered by a third party.

### 17. NOTICE PROCEDURE.

Notice, when required hereunder, will be sent by certified, or registered U.S. Mail, postage prepaid, Federal Express, Airborne Express or a comparable over-night service, to the respective parties as set forth below.

As to KeyBank      Lynda Umbreit
Vice President - Cash Management Sales
KeyBank National Association

5

88 East Broad Street
Columbus, Ohio 43215

As to CheckFree

William C. Buckham
Vice President and Assistant General Counsel
CheckFree Corporation
6000 Perimeter Drive
Dublin, OH 43017

### 18. EXCLUSIVE AGREEMENT.

The terms set forth in this Agreement represent the entire understanding and agreement of the parties with respect to the subject matter hereof. No representations, warranties, or promises are made other than as expressly set forth herein. No services other than the Services will be implied to be an obligation of KeyBank under this Agreement, and any monitoring of Transmissions which KeyBank may undertake, if any, shall not be considered a Service or other obligation owed to CheckFree.

### 19. RIGHT TO CONTRACT.

Each of the parties warrants that neither its execution and delivery of this Agreement nor its performance of the provisions hereof is, or will constitute, a violation on its part of any contract, indenture, or other agreement or relationship to which it is a party or by which it is bound, and hereby agrees that is will indemnify and save harmless the other party from and against any loss, costs, liability, damages, or expense by reason of any claim which may be asserted to the contrary by any third party.

### 20. SOFTWARE OWNERSHIP.

All specifications, tapes, and programs utilized or developed by KeyBank in connection with the Services, Operations, or otherwise in connection with the performance of this Agreement are and will remain the absolute property of KeyBank. All specifications, tapes, and programs utilized or developed by CheckFree in connection with the Services, Operations, or otherwise in connection with the performance of this Agreement are and will remain the absolute property of CheckFree.

### 21. TAXES.

In the event that the relationship crated between KeyBank and CheckFree under this Agreement, or as a result of the performance of the Service or Operations or of any other aspect of the relationship gives rise to any tax responsibility, exclusive of income and similar taxes, payable to the State of Ohio, any other state or political subdivision thereof or to the Internal Revenue Service, or any other subdivision of the federal government, such obligation, regardless of whether or not assessed against CheckFree, will be the responsibility of CheckFree. In the event that KeyBank should be required to pay any such tax obligation, CheckFree will reimburse KeyBank upon demand thereof.

### 22. RELATIONSHIP.

The parties agree that the parties hereto are acting hereunder as independent contractors and nothing in this Agreement is intended nor shall be construed to create a joint venture, partnership or similar business arrangement.

### 23. CONSTRUCTION; APPLICABLE LAW.

This Agreement shall be governed and construed in accordance with the laws of the State of Ohio. Paragraph headings herein are for convenience only and shall not influence the construction or interpretation of this Agreement.

6

Executed effective as of the 1st day of April, 1999 (the *"Effective Date"*).

**CHECKFREE CORPORATION**

By:      /s/ *John Limbert*
----------------------------------------

Title:   Executive Vice President
----------------------------------------

**KEYBANK NATIONAL ASSOCIATION**

By:      /s/ *Sue E. Zazon*
----------------------------------------

Title:   Senior Vice President
----------------------------------------

7

| This 10-K Filing | Date | Referenced-On Page | | Other Filings |
|---|---|---|---|---|
| | | First | Last | |
| | ▼ 4/1/99 | 1 | | |
| For The Period Ended | 6/30/02 | | | 11-K |
| Filed On | 9/25/02 | | | |
| Filed As Of | 9/26/02 | | | |
| Top | | | | List All Filings |

*Alternative Formats:*  Rich Text / Word (.rtf),  Text (.txt),  EDGAR (.sgml),  XML (.xml),  et al.

Copyright © 2008 *Fran Finnegan & Company*  All Rights Reserved.
www.secinfo.com - Sat, 9 Feb 2008 20:54:10.1 GMT - Help at SEC Info

# EXHIBIT "E"







Doc# 20040321A93

NO.________

NAME OF BUSINESS

OMEGA CONSULTING

7706 Pinebrook #100

San Antonio, Tx 78230

CERTIFICATE OF
ASSUMED NAME

FILED IN THE OFFICE OF THE BEXAR COUNTY CLERK THIS______ DAY OF______ A.D. 20__ AT______ O'CLOCK_____ M.

GERRY RICKHOFF
COUNTY CLERK
BEXAR COUNTY, TEXAS

BY:____________
DEPUTY

Doc# 20040321A93

Fees $11.00

BEXAR RICKHOFF COUNTY CLERK

Doc# 20040321A93

# ASSUMED NAME CERTIFICATE

**FOR AN UNINCORPORATED BUSINESS OR PROFESSION OTHER THAN A LIMITED PARTNERSHIP, REGISTERED LIMITED LIABILITY PARTNERSHIP, OR LIMITED LIABILITY COMPANY**

PURSUANT TO THE PROVISIONS OF CHAPTER 36, TITLE 4, BUSINESS AND COMMERCE CODE OF THE STATE OF TEXAS, THE UNDERSIGNED CERTIFIES THE FOLLOWING:

1. THE ASSUMED NAME AND ITS BUSINESS ADDRESS UNDER WHICH THE BUSINESS IS NOW OR IS TO BE CONDUCTED IS:

| ASSUMED NAME | BUSINESS ADDRESS |
|---|---|
| OMEGA CONSULTING | 7706 Pinebrook #100<br>San Antonio, Tx 78230 |

**IRS** DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
CINCINNATI    OH    45999-0023

Date of this notice:  12-14-2006

Employer Identification Number:
20-5961093

005065.346929.0016.001 2 MB 0.563 1010

Form:  SS-4

Number of this notice:  CP 575 A

OMEGA CONSULTING
7706 PINEBROOK DR STE C
SAN ANTONIO  TX   78230

For assistance you may call us at
1-800-829-4933

005065

IF YOU WRITE, ATTACH THE
STUB OF THIS NOTICE.

## WE ASSIGNED YOU AN EMPLOYER IDENTIFICATION NUMBER

Thank you for applying for an Employer Identification Number (EIN).  We assigned you EIN 20-5961093.  This EIN will identify your business account, tax returns, and documents, even if you have no employees.  Please keep this notice in your permanent records.

When filing tax documents, please use the label we provided.  If this isn't possible, it is very important that you use your EIN and complete name and address exactly as shown above on all federal tax forms, payments and related correspondence. Any variation may cause a delay in processing, result in incorrect information in your account or even cause you to be assigned more than one EIN.  If the information isn't correct as shown above, please correct it using tear off stub from this notice and return it to us so we can correct your account.

Based on the information from you or your representative, you must file the following form(s) by the date(s) shown.

        Form 941                      01/31/2008
        Form 1120                     08/15/2007
        Form 940                      01/31/2008

If you have questions about the form(s) or the due dates(s) shown, you can call or write to us at the phone number or address at the top of the first page of this letter.  If you need help in determining what your tax year is, see Publication 536, Accounting Periods and Methods, available at your local IRS office or you can download this Publication from our Web site at www.irs.gov.

If you believe your yearly employment taxes will be $1,000 or less for the tax year (average annual wages of $4,000 or less), please contact us on 1-800-829-0115. You will be required to file Form 944, Employer's Annual Federal Tax Return, rather than Form 941, Employer's Quarterly Federal Tax Return.  This return will be due annually, on January 31, following the end of the tax year.  You can pay your tax liability annually when you file your return, or you may choose to make more frequent deposits to reduce the balance due with your annual return.  If you use a Reporting Agent or Tax Practitioner, inform him or her of your Form 944 filing requirement.  If your annual liability rises to $2,500 or more, you will be required to make deposits. If you do not make the required deposits, you may be subject to penalties and/or interest.  Please refer to Publication 15 (Circular E), Employer's Tax Guide, for deposit requirements and for more details on the Form 944 annual filing program.

# EXHIBIT "F"

********************************* RECEIPT ***********************************************

STATE OF OHIO
DEPARTMENT OF STATE

**F0734-1220**

NUMBER: FL488681

SHERROD BROWN
SECRETARY OF STATE

RECEIPT NO.: 19462

DATE: 9/06/85

F734-1220    0076

RECEIVED OF
OR FILED BY:   ULMER,BERNE,LARONGE,GLICKMAN ET AL
THE SUM OF $    10.00   FOR FILING: FMR CHN                               OF
LEE WAY HOLDING COMPAN  FORMERLY CL MOTOR FREIGHT, INC.

RETURNED TO:                     19462          FMR  $    10.00
    ULMER,BERNE,LARONGE,GLICKMAN ET AL          CHN  $
    ATT:P.A.ROME                                     $
    900 BOND COURT BLDG.                             $
    CLEVELAND, OH 44114-1583                         $
NAME:                                   TOTAL FEE:  $    10.00
LEE WAY HOLDING COMPANY FORMERLY CL MOTOR FREIGHT, INC.

********************************* RECEIPT ***********************************************

F0734-1221

**Department of State**

# The State of Ohio

### Sherrod Brown
Secretary of State

FL488681

## ❖ Certificate ❖

It is hereby certified that the Secretary of State of Ohio has custody of the Records of Incorporation and Miscellaneous Filings; that said records show the filing and recording of: _____ FMR CHN _____

_____ of:

LEE WAY HOLDING COMPANY FORMERLY CL MOTOR FREIGHT, INC.



**United States of America**
**State of Ohio**
**Office of the Secretary of State**

Recorded on Roll ___ F734 ___ at Frame ___ 1222 ___ of the Records of Incorporation and Miscellaneous Filings.

Witness my hand and the seal of the Secretary of State, at the City of Columbus, Ohio, this ___ 29TH ___ day of ___ AUS ___, A.D. 19 ___ 85 ___.

*Sherrod Brown*
**Sherrod Brown**
Secretary of State



F0734-1222

### State of Delaware



D. BURNS
8-29-85
$10.00

### Office of Secretary of State

I, MICHAEL HARKINS, SECRETARY OF STATE OF THE STATE OF DELAWARE DO HEREBY CERTIFY THE ATTACHED IS A TRUE AND CORRECT COPY OF CERTIFICATE OF OWNERSHIP OF THE "CL MOTOR FREIGHT, INC." A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, MERGING "LEE WAY MOTOR FREIGHT, INC." A CORPORATION ORGANIZED AND EXISTING UNDER THE LAWS OF THE STATE OF DELAWARE, PURSUANT TO SECTION 253 OF THE GENERAL CORPORATION LAW OF THE STATE OF DELAWARE AS RECEIVED AND FILED IN THIS OFFICE THE THE TWENTY-SEVENTH DAY OF FEBRUARY, A.D. 1985, AT 2 O'CLOCK P.M.

AND I DO HEREBY FURTHER CERTIFY THAT THE AFORESAID CORPORATION SHALL BE GOVERNED BY THE LAWS OF THE STATE OF DELAWARE

AND I DO HEREBY FURTHER CERTIFY THAT THE SAID "CL MOTOR FREIGHT, INC." HAS RELINQUISHED ITS CORPORATE TITLE AND ASSUMED



Michael Harkins, Secretary of State

**AUTHENTICATION:**

**DATE:**





F0734-1223

### State of Delaware



## Office of Secretary of State

IN PLACE THEREOF "LEE WAY HOLDING COMPANY"

: : : : : : : : : : :

Michael Harkins, Secretary of State

AUTHENTICATION:

DATE:

F0734-1224

CERTIFICATE OF OWNERSHIP AND MERGER

MERGING

LEE WAY MOTOR FREIGHT, INC.

INTO

CL MOTOR FREIGHT, INC.

CL Motor Freight, Inc., a corporation organized and existing under the laws of the State of Delaware, does hereby certify as follows:

FIRST: That this corporation was incorporated on September 22, 1976 pursuant to the General Corporation Law of the State of Delaware.

SECOND: That this corporation owns all of the outstanding shares of stock of Lee Way Motor Freight, Inc., a corporation incorporated on May 29, 1936 pursuant to the General Corporation Law of the State of Delaware.

THIRD: That this corporation, by the following resolutions of its Board of Directors, duly adopted at a meeting held on the 27th day of February 1985, determined to and did merge into itself said Lee Way Motor Freight, Inc.:

> RESOLVED, that CL Motor Freight, Inc., a Delaware corporation, merge, and it hereby does merge into itself, its wholly-owned subsidiary, Lee Way Motor Freight, Inc., a Delaware corporation, and assumes all of the obligations of said subsidiary;

> RESOLVED FURTHER, that the merger shall be effective upon the date of filing with the Secretary of State of Delaware;

> RESOLVED FURTHER, that the proper officers of this corporation be and they hereby are directed to make and execute a Certificate of Ownership and

F0734-1225

Merger setting forth a copy of the resolutions
to merge said Lee Way Motor Freight, Inc. and
assume its liabilities and obligations, and
the date of adoption thereof, and to cause the
same to be filed with the Secretary of State
of Delaware and a certified copy recorded in
the office of the Recorder of Deeds of New
Castle County and to do all acts and things
whatsoever, whether within or without the
State of Delaware, which may be in any way
necessary or proper to effect said merger; and

RESOLVED FURTHER, that this corporation change
its corporate name by changing Article FIRST
of th. Restated Certificate of Incorporation
of this corporation to read as follows:

"FIRST:  The name of the Corporation is
LEE WAY HOLDING COMPANY".

FOURTH:  Anything herein or elsewhere to the contrary
notwithstanding this merger may be amended or terminated and
abandoned by the Board of Directors of CL Motor Freight, Inc. at
any time prior to the date of filing the merger with the Secretary
of State.

IN WITNESS WHEREOF, said CL Motor Freight, Inc. has
caused this certificate to be signed by Gerard W. McIntyre, its
President, and attested by William C. Buckham, its Secretary,
this 27th day of February, 1985.

CL MOTOR FREIGHT, INC.

By _____
        Gerard W. McIntyre, President

ATTEST:

By _____
    William C. Buckham, Secretary

- 2 -

# EXHIBIT "G"

✗ See Page 0

In re **LEE WAY** HOLDING COMPANY, Debtor(s)

Case No. 2-85-00661 Chapter 11

UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF OHIO, EASTERN DIVISION

100 B.R. 950; 1989 Bankr. LEXIS 853; 21 Collier Bankr. Cas. 2d (MB) 466; 19 Bankr. Ct. Dec. 629

May 19, 1989, Decided
May 19, 1989, Filed and Entered

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff creditor filed a motion to disqualify defendant as co-counsel for debtor and demanded that defendant return all fees paid for its services to debtor as result of a violation of the Bankruptcy Code, 11 U.S.C.S. § 327.

**OVERVIEW:** Defendant was co-counsel for debtor, and was also counsel for a corporation that had entered into an executory contract with debtor. Defendant did not disclose its relationship with the corporation as required by Fed. R. Bankr. P. 2014 when it was appointed counsel for the debtor. Plaintiff creditor moved to disqualify defendant and to have all fees paid to defendant returned. The court held that the Bankruptcy Code, 11 U.S.C.S. § 327 required disqualification of an attorney upon objection of a creditor if there was an actual conflict of interest. A conflict of interest existed because defendant represented the debtor while also representing the debtor's creditor in negotiating an executory contract between them. Further, defendant was not a disinterested party because defendant negotiated pre-petition contract and then negotiated additional terms to the contract after the debtor filed bankruptcy. Therefore, the court granted plaintiff's motion to disqualify defendant as debtor's counsel.

**OUTCOME:** The court granted plaintiff creditor's motion to disqualify defendant attorney because defendant failed to disclose its representation of both debtor and another corporation in its negotiation of a contract between the two and thus, the representation qualified as a conflict of interest mandating disqualification of defendant as bankruptcy debtor's counsel.

**CORE TERMS:** executory contract, negotiation, appointment, disinterested persons, professional judgment, disclosure, disclose, truck, interest adverse, appearance of impropriety, disgorgement, plan of reorganization, conflict of interest, postpetition, negotiated, accountants, materially, adversely, investors, Disciplinary Rule, fiduciary duty, disqualification, incorporator, unperformed, confidence, law firm, fees awarded, adverse interest, actual conflict, equity security

### LexisNexis® Headnotes Hide Headnotes

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview

*HN1* ♣ The standard for employment of professionals in bankruptcy proceedings is governed by the Bankruptcy Code. 11 U.S.C.S. § 327(a).

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > Court Approval
*HN2* ♣ See 11 U.S.C.S. § 327(a).

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility
*HN3* ♣ See 11 U.S.C.S. § 327(c).

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > Debtors in Possession & Trustees
Bankruptcy Law > Practice & Proceedings > Professional Responsibility
*HN4* ♣ Under the Bankruptcy Code, 11 U.S.C.S. § 327(c), a professional is not disqualified for employment solely because of the person's prior employment by or representation of a secured or unsecured creditor. However, if that professional is employed by the trustee, or debtor-in-possession, he may no longer represent that creditor in connection with the case.

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility
*HN5* ♣ The Bankruptcy Code, 11 U.S.C.S. § 327(c) prohibits the representation of the debtor while simultaneously representing a creditor in connection with the case.

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility
*HN6* ♣ The Bankruptcy Code, 11 U.S.C.S. § 327(a) establishes two requirements for employment of professionals by a debtor: (1) a lawyer may not represent an interest adverse to the estate; and (2) he must be a "disinterested person," i.e., he must not have interests materially adverse to those of the debtor.

Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals

> General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN7* ⬦ The determination of an interest adverse to the estate must be made before the order appointing and approving counsel is entered. It is the duty of the applicant to reveal all connections with the debtor, its creditors, and other parties-in-interest in the application for appointment. Indeed, if the disclosures are not made at the time the application for appointment is filed, the court will be unable to determine whether an adverse interest exists.

Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals
> General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN8* ⬦ An adverse intere t exists if the applicant is not a disinterested person.

Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals
> General Overview

*HN9* ⬦ See 11 U.S.C.S. § 101(13).

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Appointment
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals
> General Overview

*HN10* ⬦ See Fed. R. Bankr. P. 2014.

Bankruptcy Law > Practice & Proceedings > Professional Responsibility
Governments > Fiduciary Responsibilities
Labor & Employment Law > Employment Relationships > Fiduciary Responsibilities

*HN11* ⬦ Fed. R. Bankr. P. 2014 requires the professional seeking appointment to disclose in his application to the court all actual or potential conflicts which may bear upon his eligibility to serve as counsel for the debtor. This requirement of full disclosure arises from the fiduciary obligation that an attorney ultimately employed in a bankruptcy proceeding owes to the court.

Bankruptcy Law > Practice & Proceedings > Professional Responsibility
Legal Ethics > Client Relations > Accepting Representation
Legal Ethics > Sanctions > General Overview

*HN12* ⬦ See Ohio Code of Professional Responsibility DR 5-105.

Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals
> General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN13* ⬦ Only in the clearest cases should counsel hazard to represent interests which are or may become adverse, even after disclosing his dual representation.

Contracts Law > Breach > Material Breach
Contracts Law > Breach > Nonperformance
Contracts Law > Types of Contracts > Executory Contracts

*HN14* An executory contract is a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other.

Bankruptcy Law > Case Administration > Administrative Powers > Executory Contracts & Unexpired Leases > General Overview
Contracts Law > Contract Interpretation > General Overview
Contracts Law > Types of Contracts > Executory Contracts

*HN15* The Bankruptcy Code, 11 U.S.C.S. § 365 does not define the term "executory contract," yet its legislative history reveals that the intent of Congress was to construe executory contracts as those on which performance remains due to some extent on both sides.

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > General Overview
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN16* A professional is not disqualified for employment solely because of the person's prior employment by or representation of a secured or unsecured creditor. However, if that professional is employed by the debtor, he may no longer represent that creditor in connection with the case. The simultaneous representation of a creditor in connection with representation of a debtor, therefore, is prohibited under the Bankruptcy Code, 11 U.S.C.S. § 327(c).

Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN17* To be qualified to represent the debtor, a lawyer must not hold or represent an interest adverse to the estate and must be a disinterested person.

Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview

*HN18* See 11 U.S.C.S. § 101(13)(E).

Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility

*HN19* The standards of disinterestedness and absence of adverse interest are intended to address not only actual and potential conflicts, but also the appearance of impropriety or conflict irrespective of the integrity of the person or firm under consideration. A disinterested person should be divested of any scintilla of personal interest which might be reflected in the attorney's decision concerning estate matters. The courts are absolutely uniform as to one command: the bankruptcy court must--no matter how unpleasant a task it may be--ensure the integrity of the bankruptcy process. The interests of maintaining public confidence in the bankruptcy system must prevail.

Bankruptcy Law > Practice & Proceedings > Professional Responsibility

Bankruptcy Law > Case Administration > General Overview
Civil Procedure > Judgments > General Overview
Legal Ethics > Sanctions > General Overview

*HN21* Ohio Code of Professional Responsibility (Rule) DR 5-105(A)(1983) requires that an attorney refuse proffered employment if that employment will, or is likely to, adversely affect the exercise of his independent professional judgment. Rule 5-105(B) adds that a lawyer cannot continue in the representation of multiple clients if such employment will, or is likely to, adversely affect the exercise of his independent judgment. Rule 5-105(C) permits multiple representation of clients, however, if: (1) it is obvious that the attorney can adequately represent the interests of each of those clients, and (2) only after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

Bankruptcy Law > Practice & Proceedings > Professional Responsibility
Legal Ethics > Sanctions > General Overview

*HN22* See Model Federal Rules of Disciplinary Enforcement Rule IV(B).

Bankruptcy Law > Case Administration > Examiners, Officers & Trustees > Appointment
Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > Committees
Bankruptcy Law > Debtor Benefits & Duties > General Overview

*HN23* The strictures of Fed. R. Bankr. P. (Rule) 2014 are not met by disclosure to a committee of creditors (Committee). The Committee does not approve applications for appointment of professionals under the Bankruptcy Code, 11 U.S.C.S. § 327. It is the duty of the professional seeking employment under § 327 to disclose by a verified statement his connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants. Indeed, the disclosure requirements imposed under Rule 2014 and § 327 require complete disclosure by the professional seeking employment of all facts impacting upon his eligibility for appointment.

Bankruptcy Law > Case Administration > Professional Services > Retention of Professionals > General Overview
Bankruptcy Law > Practice & Proceedings > Professional Responsibility
Governments > Fiduciary Responsibilities

*HN24* Without question counsel owes a fiduciary duty of loyalty to the estate. This duty requires the exercise of independent professional judgment, unfettered from compromising influences.

Bankruptcy Law > Practice & Proceedings > Professional Responsibility
Governments > Fiduciary Responsibilities
Torts > Intentional Torts > Breach of Fiduciary Duty > General Overview

*HN25* The power of a court to order disgorgement of fees awarded to an attorney as a result of the breach of his fiduciary duty is without question.

**COUNSEL:** Roger Pascal, Esq., Schiff, Hardin & Waite, Chicago, Illinois, Russell A. Kelm,

Esq., Schwartz, Kelm, Warren & Rubenstein, Columbus, Ohio, Attorneys for PepsiCo, Inc.

Louis F. Cohen, Esq., Cohen, Malad & Hahn, Indianapolis, Indiana, Attorney for **Lee Way Holding Company**.

Charles R. Saxbe, Esq., Chester, Hoffman, Willcox & Saxbe, Columbus, Ohio, Attorney for Cohen, Malad & Hahn.

Frederick M. Luper, Esq., Luper, Wolinetz, Sheriff & Neidenthal, Columbus, Ohio, Chapter 11 Trustee and Attorney for the Estate.

Donald R. Harris, Esq., Jenner & Block, Chicago, Illinois, Attorney for Chapter 11 Trustee..

Robert J. Sidman, Esq.

**JUDGES:** [**1] Donald E. Calhoun, Jr., United States Bankruptcy Judge.

**OPINION BY:** CALHOUN, JR.

**OPINION**

[*950] OPINION AND ORDER ON PEPSICO, INC.'S MOTION TO DISQUALIFY COHEN, MALAD & HAHN

CALHOUN, JR.,

U.S.B.J.

This matter is before the Court on the motion of PepsiCo, Inc. ("PepsiCo"), a creditor herein, to disqualify the law firm of Cohen, Malad & Hahn (formerly known as Dillon & Cohen, and hereinafter referred to as ("CMH"), as co-counsel for the debtor, **Lee Way Holding Company** ("debtor"). PepsiCo also demands that CMH return all fees paid, and that it be denied future compensation. This matter came on for oral hearing, following [**2] which the Court took this matter under advisement pending [*951] the submission of post-hearing briefs. Those briefs have been submitted.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding arising under 28 U.S.C. § 157(b)(2)(A). *See, also, In re GHR Energy Corp.*, 60 B.R. 52 (Bankr. S.D. Tex. 1985). The following opinion and order constitutes findings of fact and conclusions of law.
**I. STATEMENT OF FACTS**

On the basis of all the evidence in the record, the Court makes the following findings of fact:

1. The debtor filed its petition for relief under Chapter 11, Title 11 of the United States Code on March 7, 1985. On the same date, the debtor filed an application to appoint attorneys for the debtor, to-wit: Squire, Sanders and Dempsey; Lewis F. Cohen and Gregory F. Hahn of Dillon & Cohen; and A.B. Glickman of Ulmer, Berne, Laronge, Glickman & Curtis ("Ulmer-Berne"). Paragraph five of that application states:
To the best of your applicant's knowledge, said attorneys represent no other entity in connection with this case, are disinterested persons, and represent or hold no interest [**3] adverse to the matters on which they are to be employed.
This application was approved by the Court by order entered April 1, 1985.

2. At the time the debtors' petition in this case was filed, the debtor had an executory contract with a corporation known as Transportation Equipment Services, Inc. ("TES"). TES is in the business of buying and selling used trucking equipment. TES was a client of CMH at the time the debtor filed bankruptcy. In fact, CMH had represented TES for several years prior to representing the debtor.

3. In 1984 **Lee Way** Motor Freight, predecessor to the debtor, was a wholly-owned subsidiary of PepsiCo. PepsiCo made a decision to sell **Lee Way,** and its intentions generated the interest of Gerard **McIntyre ("McIntyre"). McIntyre** was the President of a trucking company known as Commercial Lovelace Motor Freight ("CL"). **McIntyre** was interested in acquiring **Lee Way,** and by that acquisition greatly expanding the size and extent of CL's commercial operations.

4. Thereafter, PepsiCo and CL negotiated a sale of **Lee Way** to CL. The terms of that sale in pertinent part, required CL to pay PepsiCo $ 8 million in cash, which cash CL was to receive from sales of CL and **Lee Way** [**4] equipment to TES. TES' representatives, Edward Mulcahey ("Mulcahey") and Pete Poston ("Poston"), were involved in the negotiations with respect to CL's acquisition of **Lee Way.**

5. After CL acquired **Lee Way** from PepsiCo, **McIntyre** and Mulcahey negotiated additional sales from CL to TES, including a final $ 3.2 million sale, now known as the executory contract.

6. The executory contract was negotiated in late 1984 and early 1985, and was memorialized by agreement entered into between CL and TES on February 27, 1985.

7. Lewis F. Cohen's ("Cohen") time records show that he billed to his client TES 5.25 hours over the period January 29-30, 1985 for meetings with Poston and Mulcahey with respect to their interest in CL.

8. Gregory Hahn ("Hahn"), an attorney employed with CMH, is designated as the incorporator and registered agent for TES in a section of the annual report of TES filed with the Indiana Secretary of State for 1985. Hahn holds general powers of attorney for TES, which powers have never been revoked. Hahn identifies himself in that annual report as an incorporator, officer and **director.**

9. Subsequent to the merger of CL and **Lee Way,** CL/**Lee Way** found itself in financial distress. [**5] McIntyre asked Mulcahey to recommend a good bankruptcy attorney. Mulcahey referred **McIntyre** to CMH.

10. **McIntyre** met with Cohen on January 31, 1985 with respect to CMH's representation of **Lee Way.** Mulcahey and Poston were also present at this meeting as [*952] they had other business to discuss with CMH.

11. At the meeting held January 31, 1985, Cohen advised **McIntyre** that CMH had an attorney-client relationship with TES, and requested that TES and CL/**Lee Way's** unfinished business relating to the transfer of truck titles under the executory contract be completed before engaging in the representation of the debtor.

12. At the conclusion of January 31, 1985 meeting, Cohen and **McIntyre** met privately and reviewed CL/**Lee Way's** financial situation. Cohen advised **McIntyre** that if retained by CL/**Lee Way,** his firm would not represent TES in any of its dealings with CL/**Lee Way.** Mulcahey and Poston were also subsequently advised of and agreed to this stipulation.



13. On February 5, 1985, Hahn and Eric Redman ("Redman") of CMH met with William Buckham who was the Vice President and General Counsel for CL, and other members of CL/**Lee Way** management. They discussed CMH's past and ongoing relationship [**6] with TES and confirmed that CMH would not represent TES in any dealings with CL/**Lee Way.**

14. During the remainder of February, 1985, several meetings were held between representatives of CL/**Lee Way,** and its legal counsel, and creditors and lenders in an effort to keep the company operating.

15. One important party with whom CL/**Lee Way's** representatives met was TreFoil Corporation ("TreFoil"). As stated, **McIntyre** and Mulcahey had negotiated for the sale of $ 3.2 million of **Lee Way** equipment to TES. TreFoil was agreeable to continuing to extend CL/**Lee Way** the capital it needed in order to operate on the basis of this agreement.

16. Prior to the filing of the Chapter 11 petition in this Court by the debtor, CL's board of **directors** voted to merge CL with **Lee Way** to form the **Lee Way Holding Company,** the debtor herein, in order to facilitate the administration of the bankruptcy estate. The board also decided to memorialize the $ 3.2 million sales agreement between CL/**Lee Way** and TES, since the performance of that agreement was incomplete. Accordingly, the executory contract memorializing that sale agreement was drafted and signed February 27, 1985.

17. The petition for Chapter 11 protection [**7] was prepared at the Squire, Sanders & Dempsey law office in Columbus, Ohio by Cohen and Redman. They also prepared a motion to employ attorneys, which motion was signed by **McIntyre.** These documents were examined and approved prior to filing by Buckham.

18. Following the filing of the Chapter 11 petition, a meeting was held between Cohen and the Unofficial Creditors' Committee ("Committee") on March 21, 1985. At that meeting, Cohen discussed, among other things, the terms of the executory contract, and explained CMH's past and ongoing relationship with TES. He advised those present at that meeting that CMH would not represent TES in any dealings with the debtor. No objection was raised to Cohen's representation of the debtor at that time.

19. The executory contract memorializing the $ 3.2 million dollar sale agreement was reviewed, amended, and approved by the Committee. On May 3, 1985, the Court approved the executory contract without objection from any party.

20. The executory contract was a major topic of discussion at the March 21, 1985 meeting of creditors. Robert Sidman, attorney for the Committee, testified that:
My recollection of the conversations regarding TES at the meeting [**8] of March 21 were that there was a pending executory contract involving TES and the debtor. And there had to be a decision made by the debtor and the Committee as to whether or not that contract should or should not be accepted in the bankruptcy . . . . That was a fairly urgent item of business because it was a significant contract. It was something that had to be done fairly quickly in the bankruptcy.

21. Testimony as to who actually prepared the executory contract is conflicting. A. B. Glickman, co-counsel to the debtor, testified that he believed the executory contract was prepared by CMH. Cohen, Hahn [*953] and Redman of CMH testified that they had no recollection of either drafting or delivering a proposed executory contract to Glickman. Mulcahey and Poston testified that they did not know who created the original draft of the executory contract. **McIntyre** testified that he believed it had been prepared by Buckham. Regardless of who actually drafted or delivered the executory contract, it is clear from the record that CMH represented TES in the negotiations of the terms of that contract.

8

22. The Committee and the debtor, after negotiation, made three changes to the executory contract prior [**91 to submitting it to the Court for approval. These changes include:
(1) Permitting the purchaser (TES) to receive the trucks without removing the gas in the tanks;

(2) Extending the performance date to August 1, 1985 in order to fulfill the original intention of the contract to allow ninety days for performance;

(3) Providing additional security for the debtor by obtaining a lien on all titles transferred to TES pending final payment.

23. Following the filing of bankruptcy, the debtor engaged in the development and implementation of a plan of reorganization. Redman and Cohen were involved in the formulation of proposals for a plan of reorganization, as was TES as it was apparently the only entity with the requisite interest and ability to effect a plan of reorganization.

24. The debtor was unsuccessful in developing a feasible plan of reorganization, and on October 24, 1985 the debtor's operations ceased. Following the termination of the debtor's operations, TES expressed an interest in acquiring the assets of the debtor, and submitted proposals to purchase those assets to the Committee. TES withdrew that offer on November 6, 1985.

25. At the meeting of creditors held March 21, [**10] 1985, as a result of Cohen's disclosure of his past and ongoing relationship, and specifically of the executory contract, Sidman and the Committee closely scrutinized that transaction. Sidman testified that:
It was discussed, and I don't know who first brought it up, that the Cohen firm was involved in either negotiating or drafting that particular contract probably for TES, and that because of that the Committee ought to scrutinize it very closely.

26. In early September of 1985, about six months after **Lee Way** filed for protection under Chapter 11, Hahn was asked by Mulcahey to convey to another trucking company, known as Suburban Motor Freight ("Suburban") a letter of intent on behalf of TES to purchase Suburban's operations. Hahn communicated with a Mr. LeGrande ("LeGrande") and Mulcahey on three separate occasions concerning the letter of intent. CMH's firm was involved in the preparation of this letter. Gene Langford ("Langford") was TES's primary counsel in the negotiations for the sale of the Suburban operations to TES.

27. At some point in time, the proposed purchase by TES of Suburban's operations became an element in a plan of reorganization being developed by the debtor [**11] in this case. When it became known that Suburban might be an element in this debtor's plan of reorganization, CMH ceased to perform any services for TES related to TES' transactions with Suburban.

28. In February of 1985, Mulcahey of TES personally loaned $ 65,000.00 to CL Investors, a group consisting of CL executives who had purchased CL stock in 1984. The purchase had been partially financed by Bank One of Columbus, N.A. ("Bank One"). When the bank loan came due in early 1985, **McIntyre,** a partner in CL Investors, asked Mulcahey for financial assistance. Mulcahey transmitted the funds to **McIntyre** by means of a wire transfer to Hahn's client trust account in early February of 1985. Hahn then delivered a check to **McIntyre** when they met in Columbus a few days later. **McIntyre** executed a promissory note, evidencing the obligation of CL Investors and paid the check to Bank One on February 20, 1985. Mulcahey testified that he personally prepared the note.

[*954] 29. Shortly after PepsiCo sold **Lee Way** to CL, an action was brought against CL in Oklahoma styled as *Uselton v. Commercial Lovelace Motor Freight, Inc.,* Case No. CIV-84-2807-W (W.D. Okla. 1984). **Lee Way** and its officers were represented [**12] by the Ulmer-Berne firm and by the firm of Pierce, Couch, Hendrickson, Johnston and Baysinger

located in Oklahoma. When TES was made a party to the lawsuit, Cohen assisted it in the retention of attorneys James Waldo and Max Tuepker in Oklahoma City as TES's counsel. TES was dismissed from the action in 1986, and all proceedings in that case against **Lee Way** have been automatically stayed.

30. In 1985, the state of Oklahoma brought an action against TES, styled *State of Oklahoma v. Transportation Equipment Services, Inc.,* Case No. CJ-85-2716 (Dist. Ct. Okla. County, Okla. 1985), to recover from TES taxes that the state of Oklahoma claimed were due on TES equipment located in Oklahoma, some of which had been acquired from CL/**Lee Way.** TES was represented in this proceeding by Max Tuepker. Hahn assisted Tuepker in negotiations with Oklahoma officials which ultimately resulted in the suit's dismissal. The matter is now an administrative claim pending before the Oklahoma State Tax Commission.

31. In the action brought by the state of Oklahoma against TES, CMH learned, during the discussion with Oklahoma officials concerning the alleged TES tax liability, that Oklahoma was contemplating [**13] action against the debtor. However, the state of Oklahoma has not to date brought an action against the debtor for any alleged tax liabilities.

32. In 1985, an action was brought in the state of Indiana, styled as *Gierhart v. Transportation Equipment Services, Inc.,* Case No. S685-1419, Marion County (Ind. Super. Ct. 1985). In that action, the plaintiff sued both TES and **Lee Way** for an alleged breach of a lease agreement. Hahn represented both TES and **Lee Way** in that action. Hahn filed an appearance on behalf of both TES and **Lee Way,** and filed a motion for change of venue on behalf of both defendants in order to avoid a default judgment and to seek a more favorable forum. In August of 1985, CMH withdrew as counsel for the defendants.

33. In November of 1985, CMH was instrumental in obtaining an emergency temporary transfer of **Lee Way's** operating authorities to Suburban Motor Freight ("Suburban"). The emergency motion was made only after discussions and agreement among **Lee Way's** management, its PUCO counsel, counsel for **Lee Way,** and counsel for the Committee. The principal concern to all parties involved in that transaction resulting in the transfer of **Lee Way's** operating authorities [**14] was that those authorities not be forfeited for non-use. The operating authorities were not lost, and were later sold as an asset of the estate.

34. CMH did not formally disclose to the Court its prior and continuous representation of TES at the time it submitted an application to the Court for employment.

## II. DISCUSSION OF LAW

[HN1]The standard for employment of professionals in bankruptcy proceedings is governed by 11 U.S.C. § 327(a), which states:

[HN2]Except as otherwise provided in this section, the trustee [debtor-in-possession], with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

[HN3] 11 U.S.C. § 327(c) adds:

In a case under Chapter 7, 12 or 11 of this title, a person is not disqualified for employment under this section solely because of such persons's employment by or representation of a creditor, unless there is objection by another creditor or the United States trustee, in which case the court shall disapprove such [**15] employment if there is an actual conflic. of interest.

Thus, [HN4]under 11 U.S.C. § 327(c), "a professional is not disqualified for employment [*955] solely because of the person's prior employment by or representation of a secured or unsecured creditor." S. Rep. No. 95-989, 2d Sess. 38 (1978). However, if that professional is employed by the trustee, or debtor-in-possession, he may no longer represent that creditor in connection with the case. 124 Cong. Rec. H11091 (daily ed. September 28, 1978); S17408 (daily ed. October 6, 1978). In the case of *In re AOV*

_Industries, Inc._, 797 F.2d 1004, 1011 (D.C. Cir. 1986), the Court of Appeals for the District of Columbia held that [HN5] 11 U.S.C. § 327(c) prohibits the "representation of the debtor while simultaneously representing a creditor in connection with the case," citing in support the decision of the Sixth Circuit Court of Appeals in the case of _In re Georgetown of Kettering, Ltd._, 750 F.2d 536, 540 and n. 7 (6th Cir. 1984).

The court in _AOV Industries, Inc._ also stated at page 1011 that [HN6] 11 U.S.C. § 327(a) establishes two requirements for employment of professionals by a debtor:

First, a lawyer may not represent an interest adverse [**16] to the estate; second, he must be a "disinterested person," which means _inter alia,_ he must not have interests "materially adverse" to those of the debtor.

[HN7] The determination of an interest adverse to the estate must be made before the order appointing and approving counsel is entered. _In re H.L. Stratton, Inc._, 51 F.2d 984, 987 (2d Cir. 1931), cert. den. 284 U.S. 682, 52 S. Ct. 199, 76 L. Ed. 576 (1931). It is the duty of the applicant to reveal all connections with the debtor, its creditors, and other parties-in-interest in the application for appointment. Bankruptcy Rule 2014; _In re Hadleman Pipe & Supply Company_, 417 F.2d 1302, 1304 (9th Cir. 1969); and _In re D. H. Overmeyer Telecasting Co., Inc._, 29 B.R. 647, 750 (Bankr. N.D. Ohio 1983). Indeed, if the disclosures are not made at the time the application for appointment is filed, the Court will be unable to determine whether an adverse interest exists. _Hadleman Pipe & Supply Company_ at 1304.

[HN8] An adverse interest exists if the applicant is not a disinterested person. The term disinterested person is defined under [HN9] 11 U.S.C. § 101(13) in pertinent part as follows:

In this title

(13) "disinterested person" [**17] means person that--
(A) is not a creditor, an equity security holder, or an insider; . . . .

(D) is not and was not, within two years before the date of the filing of the petition, a **director,** officer, or employee of the debtor . . . .

(E) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . .

[HN10] Bankruptcy Rule 2014 implements 11 U.S.C. § 327(c), and states that:

An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327 or § 1103 of the Code shall be made only on application of the trustee or committee, stating the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, _and, to the best of the applicant's knowledge, all of the persons's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants._ The application shall [**18] be accompanied by a ve ified statement of the person to be employed setting forth the person's connections with the debtor, creditors, or any other party in interest, their respective attorneys and accountants. [Emphasis added.]

[HN11] Bankruptcy Rule 2014 requires the professional seeking appointment to disclose in his application to the Court all actual or potential conflicts which may bear upon his eligibility to serve as counsel for the debtor. _In re Roberts_, 75 B.R. 402, 410 (Bankr. D. Utah 1987); _In re Thompson_, 54 B.R. 311, 315 [*956] (Bankr. N.D. Ohio 1985), affirmed, 77 B.R. 113 (N.D. Ohio 1987). This requirement of full disclosure arises from the fiduciary obligation that an attorney ultimately employed in a bankruptcy proceeding owes to the Court. _Thompson_ 54 B.R. at 315; _Matter of Roger J. Au and Son, Inc._, 71 B.R. 238, 241 (N.D. Ohio 1986). The court in _Thompson_ has observed at page 315 that:

The famous words of Judge Cardozo best describe this fiduciary duty: "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." _Meinhard v. Salmon_, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928).

Relevant also to a determination [**19] of the issues before us are the provisions of the Ohio Code of Professional Responsibility. [HN12] Disciplinary Rule 5-105 of Canon 5 states:

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment on behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105(C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105(C).

(C) In the situations covered by DR 5-105(A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

(D) If a lawyer is required to decline employment or to withdraw from employment under DR5-105, no partner or associate of his or his firm may accept or continue such [**20] employment.

In the case of _Columbus Bar Assn. v. Grelle_, 14 Ohio St. 2d 208, 212, 237 N. E. 2d 298 (1968), the Ohio Supreme Court observed that:

HN13♠Only in the clearest cases should counsel hazard to represent interests which are or may become adverse, even after disclosing his dual representation. [Emphasis added].

Addressing first the issue of whether CMH had an actual conflict of interest under 11 U.S.C. § 327(c), the Court finds significant the fact that the executory contract, though valid, was unperformed at the time the debtor filed its petition. Although the contract itself had been executed and memorialized, performance under the contract was not set to begin until August 1, 1985, and its performance was subject to approval by the Court. In the case of _In re Midwest Polychem, Ltd._, 61 B.R. 559, 561 (Bankr. N.D. Ill. 1986), the court noted that Professor Countryman defines HN14♠an executory contract as:

[A] contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. Countryman, _Executory Contracts in_ [**21] _Bankruptcy: Part I_, 57 Minn. L. Rev. 439, 460 (1973).

CMH argues that performance under the contract was complete upon transfer of the truck titles, but if this were so, the contract would not be executory. Therefore, if the contract was not executory, the Creditors Committee would have had no basis to negotiate additional changes to the contract, and the contract would not have had to be submitted to the Court for approval under 11 U.S.C. § 365, which is to say that the contract was unperformed as of the date of the filing of the debtor's petition and therefore required approval by the Court. _In re A. H. Robins Company, Inc._, 68 B. R. 705, 707 & 709 (Bankr. E.D. Va. 1986).

Moreover, the Court cannot find that the three changes made to the contract were insignificant. HN15♠The Bankruptcy Code does not define the term "executory contract", yet the legislative history to 11 U.S.C. § 365 reveals that the intent of Congress was to construe executory contracts as those "on which performance remains due [*957] to some extent on both sides." HR Rep. No. 95-595, 95th Cong., 1st Sess. 347 (1977), Reprinted in U.S. Code Cong. & Admin. News, 1978, pp. 5787, 6303.

At the time of the debtor's petition, [**22] not only did performance remain due to some extent, but the contract obligations were so far from being performed that the failure of the contracting parties to fulfill their respective obligations would have constituted a material breach. Of the three unperformed obligations, least significant was the condition that the fuel tanks not be drained prior to their delivery to TES. Of more significance were the conditions extending the performance date to fulfill the original intention of the contract, that intention being to allow ninety days for performance, and that the debtor would retain a lien on all truck titles transferred to TES pending final payment. These latter two conditions were material to the performance of the contract, so that their breach would have given rise to a cause of action against the breaching party, and/or could have constituted grounds to excuse the nonbreaching party from performance.

12

CMH contends that it did not prepare the executory contract, but the facts and evidence in the record suggest that even if it were true that the contract was not prepared by CMH, it is clear that CMH was instrumental in negotiating the terms of that contract and in completing [**23] certain transactions on TES' behalf relative to the sale of the equipment. In fact, Cohen advised **McIntyre** that before CMH could represent the debtor, he would have to complete unfinished business regarding the transfer of truck titles with respect to that sale.

Yet, at the time the petition was filed, the business relating to those truck titles was not finished. Also, additional terms of that contract remained subject to negotiation. At that point, CMH was representing the debtor in negotiating additional terms to a contract that it had been involved with while representing TES, a major creditor of the debtor. Without question, the interests of TES, as purchaser, and the debtor, as seller, were adverse. If the sale was *bona fide,* as CMH states that it was, then the Court can infer that TES would have been motivated to seek a purchase of the equipment at the lowest price possible under terms most favorable to it. The debtor would have been seeking the opposite. CMH, therefore, at different points in the transactions and negotiations resulting in the sale was representing the conflicting interests of TES and the debtor. The Court is not required to speculate as to what may have [**24] resulted from this conflict, nor accept as an excuse that the result was not detrimental to the estate. As observed by the U.S. Supreme Court:

The incidence of a particular conflict of interest can seldom be measured with any degree of certainty. The bankruptcy court need r ot speculate as to whether the result of the conflict was to delay action where speed was essential, to close the record of past transactions where publicity and investigation were needed, to compromise claims by inattention where vigilant assertion was necessary, or otherwise to dilute the undivided loyalty owed to those whom the claimant purported to represent. Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation.

*Woods v. City National Bank & Trust,* 312 U.S. 262, 269, 61 S. Ct. 493, 497, 85 L. Ed. 820 (1941).

Whether the sale under the executory contract benefitted the estate is a question that the Court cannot consider as relevant to a determination of whether CMH had an actual conflict in this case. The sale transpired nearly four years ago, and was approved by this Court absent the knowledge of CMH's representation of both TES [**25] and the debtor in that transaction. The merits of that sale cannot now be inquired into by the Court because the opportunity for a determination as to the effect of CMH's role in the sale has been lost. The Court finds that the representation by CMH of TES with respect to the sale prepetition, and its representation of the debtor with respect to the same sale postpetition was in conflict, which conflict was actual, and which conflict should have, and if known to [*958] the Court, would have precluded CMH's employment in these proceedings.

Moreover, the Court finds that CMH's postpetition representation of TES, purportedly in matters unrelated to this proceeding, to have been in violation of the proscriptions of 11 U.S.C. § 327(c). CMH's representation of TES in the state court litigation in Oklahoma, Indiana, and in this Court, which litigation involved the debtor, was in violation of 11 U.S.C. § 327(c). As noted, [HN16] "a professional is not disqualified for employment solely because of the person's prior employment by or representation of a secured or unsecured creditor." S. Rep. No. 95-989, 2d Sess. 38 (1978). However, if that professional is employed by the debtor, he may no longer represent [**26] that creditor *in connection* with the case. 124 Cong. Rec. H11091 (daily ed. September 28, 1978); S17408 (daily ed. October 6, 1978); *AOV Industries,* 797 F.2d at 1011. The simultaneous representation of a creditor in connection with this case, therefore, is prohibited under 11 U.S.C. § 327(c). *In re Georgetown of Kettering, Ltd.,* 750 F.2d 536, 540 & n. 7 (6th Cir. 1984). Those proceedings were pending at the time this Chapter 11 petition was filed, and at least two of those proceedings, involved both TES and the debtor. In the Indiana state court action, CMH represented both the debtor and TES, that is until it withdrew as counsel in that case in

1985. The representation by CMH of TES in the state court litigation, when the outcome of those cases could affect the nature and extent of the debtor's liabilities, either upon liquidation of those claims in state court upon lifting of the automatic stay if such relief were afforded, or by adjudication of those claims in this Court, was connected to this proceeding, and therefore in violation of 11 U.S.C. § 327(c).

The second part of the Court's analysis of the issues, presented in this matter focus on whether CMH's employment [**27] can be upheld under the standards found in 11 U.S.C. § 327(a). HN17 To be qualified to represent the debtor, CMH must "not hold or represent an interest adverse to the estate" and must be a "disinterested person." 11 U.S.C. § 362(a). As observed by the court in Roger J. Au & Son, Inc., 64 B.R. 600, 604 (Bankr. N.D. Ohio 1986) both parts of the test established under 11 U.S.C. § 362(a) are met when it is shown that counsel is not a disinterested person, because HN18 the Code defines disinterested person as one who:

Does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor or an investment banker specified in subparagraph (B) or (C) of this paragraph, or for any other reason.
11 U.S.C. § 101(13)(E).

HN19 The standards of disinterestedness and absence of adverse interest "are intended to address not only actual and potential conflicts, but also the appearance of impropriety or conflict irrespective of the integrity of the person or firm under consideration." In re Watson, 94 B.R. 111, 116 (Bankr. S.D. Ohio 1988). As [**28] Judge R. Guy Cole of this district observed in Watson at 116:

A disinterested person should be divested of any scintilla of personal interest which might be reflected in the attorney's decision concerning estate matters. [Citations omitted].
Judge Cole went on to observe in Watson at 117:

The courts are absolutely uniform as to one command: the bankruptcy court must--no matter how unpleasant a task it may be--ensure the integrity of the bankruptcy process. The interests of maintaining public confidence in the bankruptcy system must prevail. See, Kraft, Inc. v. Alton Box Board Co., 659 F.2d 1341, 1348-49 (5th Cir. 1981); Matter of Cropper, 35 B.R. 625, 632 (M.D. Ga. 1983).

The Court cannot conclude that CMH was disinterested under 11 U.S.C. § 327(a). CMH, as noted, was instrumental in the transactions relative to the sale of the equipment by the debtor prepetition, [*959] and yet negotiated on the debtor's behalf additional terms with respect to that sale postpetition. Moreover, at the time these negotiations were taking place, Gregory Hahn, an attorney employed with CMH, held general powers of attorney for TES, and was an incorporator, **director,** and officer of TES, [**29] which relationship posed a direct conflict to the interests of the debtor, while also giving the appearance of impropriety. Roger J. Au & Son, 64 B.R. at 605. CMH was not removed of "any scintilla of personal interest" with respect to the negotiations and decisions concerning the terms of the executory contract. Watson at 116. TES is a significant creditor of the debtor. TES was the purchaser of equipment owned by the debtor. The interests of TES and the debtor were materially adverse during the negotiations for the sale, and remain materially adverse with respect to TES' claims in this case. CMH's past and present relationship with TES was not so removed at the time it engaged in the representation of the debtor so as to eliminate the appearance of impropriety or potential for conflict.

Also troubling was CMH's transfer of the $ 65,000.00 loan from Mulcahey to CL investors. Hahn of CMH testified he did not know the true nature of the loan was to allow CL investors to pay down the Bank One loan. Hahn did, however, testify that he thought the money was for the purchase of trucks by TES from CL, and if this were true, then certainly the appearance of impropriety and potential [**30] for conflict was raised by CMH acting as a conduit for a $ 65,000.00 transfer from TES to CL/LeeWay in February of 1985, especially after CMH in January of 1985 had represented to officials of TES and of CL/**Lee Way** that it

would not represent TES in matters related to this proceeding. The Court is of the opinion that while the record does not support a finding that the $ 65,000.00 transfer created an actual conflict under 11 U.S.C. § 327(c), it without question created the appearance of impropriety and potential for conflict under 11 U.S.C. § 327(a).

The Court is of the opinion that not only was CMH's representation of TES and the debtor improper and in conflict of interest under the Bankruptcy Code, but it was also in violation of Ohio's Code of Professional Responsibility. ("CPR"). *HN20*Canon 5 of the CPR states: A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client. Ohio Rev. Code Ann. tit. 19, Canon 5 (1983).

*HN21*Disciplinary Rule 5-105(A) requires that an attorney refuse proffered employment if that employment will, or is likely to, adversely affect the exercise of his independent professional judgment. Ohio Rev. Code Ann. tit. 19, DR5-105(A) (1983). Disciplinary [**31] Rule 5-105(B) adds that a lawyer cannot continue in the representation of multiple clients if such employment will, or is likely to, adversely affect the exercise of his independent judgment. Ohio Rev. Code Ann. tit. 19, DR 5-105(B) (1983). Disciplinary Rule 5-105(C) permits multiple representation of clients, however, if: (1) it is obvious that the attorney can adequately represent the interests of each of those clients, and (2) only after "full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." Ohio Rev. Code Ann. tit. 19, DR5-105(c) (1983).

Ohio's CPR is applicable to all attorneys admitted to practice in the State of Ohio and appearing in the Federal Courts established in Ohio by virtue of the Model Federal Rules of Disciplinary Enforcement, adopted in this District by General Order 81-1 entered September 1, 1981. Rule IV(B) of the *HN22*Model Federal Rules of Disciplinary Enforcement states: B. Acts or omissions by an attorney admitted to practice before this Court, individually or in concert with any other person or persons, which violate the Code of Professional Responsibility adopted by this Court [**32] shall constitute misconduct and shall be grounds for discipline, whether or not the act or omission occurred in the course of an attorney-client relationship. *The Code of Professional Responsibility adopted by this Court is the Code of Professional Responsibility adopted by the highest court of the state [*960] in which this Court sits, as amended from time to time by that state court, except as otherwise provided by specific rule of this Court after consideration of comments by representatives of bar associations within the state.* [Emphasis added.]

The interests of TES and the debtor, as previously set forth, were of a degree of adversity that CMH should have declined employment by the debtor under DR 5-105(A). There is no doubt that the conflicting interests of the debtor and TES could affect the exercise of CMH's independent professional judgment. The conflict was such that it was, or could become, adverse, and in recognition of the potential for conflict, CMH should have refused to accept employment on behalf of the debtor. *Grelle* at 212.

Moreover, the Court cannot conclude that CMH met the standards under DR5-105(B) and (C) to permit its continued representation of the debtor. [**33] First, the representation of TES prepetition with respect to the executory contract, and of the debtor postpetition with respect to the same contract, was likely to adversely affect the exercise of CMH's professional judgment with respect to the terms and execution of that contract. Second, under DR5-105(C) the Court is unable to say that it was obvious, given the status of TES and of the debtor, that CMH could adequately represent the interests of both. Third, although CMH disclosed to the debtor its prior representation of TES, there is nothing in the record to indicate that CMH disclosed the possible effect of its representation of the debtor on the exercise of CMH's independent judgment with respect to the negotiation of the executory contract. Likewise, CMH did not disclose the possible effect of its representation of the debtor on the exercise of CMH's independent judgment with respect to CMH's continued legal representation of TES postpetition, whether or not related to these

proceedings. The conflict apparent in the relationship of TES and the debtor was obvious, and should have precluded CMH's representation of the debtor in this case. The Court finds that CMH violated DR5-105 [**34] of the CPR by representing the interests of both the debtor and TES.

There can be no doubt that had CMH disclosed its past and continuing relationship with TES at the time it sought appointment from the Court as a professional in this case, that disclosure would have prompted the Court to inquire into the nature of that relationship. If upon inquiry, the Court discovered the facts of that relationship to be as it is now known, the Court would not have approved CMH's employment. Yet, CMH's relationship with TES was not disclosed to the Court in CMH's application as required under Bankruptcy Rule 2014. In an apparent attempt to convince the Court that it complied with the intent and purpose of Rule 2014, CMH states that it revealed its relationship with TES to the Creditors' Committee, and that the Committee did not object or otherwise voice objection to CMH's employment by the debtor. *HN23* The strictures of Rule 2014 are not met by disclosure to the Committee. The Committee does not approve applications for appointment of professionals under 11 U.S.C. § 327. It is the duty of the professional seeking employment under 11 U.S.C. § 327 to disclose by a verified statement his "connections with [**35] the debtor, creditors, or any other party in interest, their respective attorneys and accountants." Bankr. R. 2014; *In re Thompson, 54 B.R. 311, 315 (Bankr. N.D. Ohio 1985), affirmed, 77 B.R. 113 (N.D. Ohio 1987).* Indeed, the disclosure requirements imposed under Rule 2014 and 11 U.S.C. § 327 require complete disclosure by the professional seeking employment of all facts impacting upon his eligibility for appointment. *Thompson, 54 B.R. at 315.*

The application seeking CMH's appointment as attorneys for the debtor fails to disclose to any extent its connections with TES. That application, at paragraph 5, states:
To the best of your applicant's knowledge, said attorneys represent no other entity in connection with this case, are disinterested persons, and represent or [*961] hold no interest adverse to the matters on which they are to be employed.
The Court finds it inconceivable that CMH could have made such an assertion to the best of its knowledge, while knowing that it had represented TES with respect to the executory contract, knowing that a member of its law firm was an incorporator, officer and **director** of TES, and knowing that it intended to continue to represent TES, [**36] whether or not in matters unrelated to this bankruptcy. The Court finds that the application seeking to employ CMH as attorneys for the debtor failed to adequately disclose to the Court CMH's connections with the debtor and with TES, and therefore should not have been approved.

CMH was not qualified for employment under the standards established by 11 U.S.C. § 327, DR5-105, and Bankruptcy Rule 2014. The Court is of the opinion that CMH's failure to disclose its relationship with TES at the time it sought appointment by this Court as counsel for the debtor, and its continuing relationship with TES after appointment, requires no less than its disqualification. This Court must be ever mindful that the stringent requirements and standards for employment of professionals under the Bankruptcy Code and Rules are designed to insure the integrity of the bankruptcy process, and the public confidence in the bankruptcy courts. *Watson, 94 B.R. at 117; Roger J. Au & Son, 64 B.R. at 606.* The conduct of CMH in this case seriously undermined the integrity and confidence of the judicial process and therefore requires CMH's disqualification.

The remaining issue to be decided is that branch [**37] of PepsiCo's motion seeking disgorgement of all fees awarded and paid to CMH in connection with its representation of the debtor in this case. *HN24* Without question counsel owes a fiduciary duty of loyalty to the estate. *Thompson, 54 B.R. at 315; Roger J. Au & Son, 71 B.R. at 241.* This duty requires the exercise of independent professional judgment, unfettered from compromising

influences. *In re Philadelphia Athletic Club, Inc.*, 20 B.R. 328, 334 (D.C. Pa. 1982). The professional obligation owed by attorneys to the courts and to the legal system was well observed by the court in *Matter of Arlan's Dept. Stores, Inc.*, 615 F.2d 925 (2d Cir. 1979) when it recited the words of the U.S. Supreme Court in case of over one hundred years' vintage. The U.S. Supreme Court expressed that obligation in the following manner:

They are officers of the law, as well as the agents of those by whom they are employed. Their fidelity is guaranteed by the highest considerations of honor and good faith, and to these is superadded the sanction of an oath. The slightest divergence from rectitude involves the breach of all these obligations. None are more honored or more deserving than those of the [**38] brotherhood who, uniting ability with integrity, prove faithful to their trusts and worthy of the confidence reposed in them. Courts of justice can best serve both the public and the profession by applying firmly upon all proper occasions the salutary rules which have been established for their government in doing the business of their clients.

*Arlan's Dept. Stores*, 615 F.2d at 944 (quoting *Baker v. Humphrey*, 101 U.S. 494, 502, 25 L. Ed. 1065 (1879)).

In representing the debtor and TES, CMH breached its fiduciary duty by failing to remove any uncompromising influences that could have impeded the exercise of its professional judgment. Too, by failing to disclose its relationship with TES at the time it sought appointment, CMH breached its fiduciary duty to this Court.

That the Court has [HN25]the power to order disgorgement of fees awarded to CMH in this case as a result of the breach of its fiduciary duty is without question. 11 U.S.C. § 327; *Woods*, 312 U.S. at 266-268; *Arlan's Dept. Stores*, 615 F.2d 943; *Matter of Chambers*, 76 B.R. 194, 195 (Bankr. M.D. Fla. 1987); *Matter of Kero-Sun, Inc.*, 58 B.R. 770, 778 (Bankr. D. Conn. 1986); *In re Damon*, 40 B.R. 367, 376 (Bankr. [**39] S.D. N.Y. 1984). CMH made no effort to disclose its connections with TES at the time it sought appointment by this Court as counsel for the debtor. Furthermore, those connections created the appearance [*962] of impropriety, and the potential for conflict. CMH's representation of the debtor with respect to the executory contract, when it had represented TES on the same contract, was in actual conflict of the interests of the debtor and TES. Lastly, CMH's acceptance of employment by the debtor, without adequate disclosure, and with knowledge of its representation of TES, constituted a violation of DR5-105. The seriousness of these breaches mandates disgorgement of all fees awarded and paid to CMH in connection with these proceedings.

## III. CONCLUSION

In summation, on the basis of the foregoing findings of fact and conclusions of law, PepsiCo's motion for disqualification and for disgorgement of fees is GRANTED.

IT IS ORDERED that CMH return to the estate the sum of $ 209,100.00 as reflected in the record as the amounts awarded as fees by prior orders of this Court. Reimbursement of expenses previously allowed to CMH are specifically excluded from disgorgement.

IT IS SO ORDERED.

Date: MAY [**40] 19th, 1989

JUDGMENT ENTRY - May 19, 1989, Filed and Entered

Pursuant to Bankruptcy Rule 9021, judgment is hereby entered granting PepsiCo, Inc.'s motion for disqualification and for disgorgement of fees. Judgment is also entered ORDERING that the law firm of Cohen, Malad and Hahn return to the estate the sum of $ 209,100.00.

IT IS SO ORDERED.

# EXHIBIT "H"

*1976*



| | | |
|---|---|---|
| **STATE OF OHIO**<br>DEPARTMENT OF STATE | **TED W. BROWN**<br>SECRETARY OF STATE | **E0207-1703**<br>**RECEIPT NO.**   55136 |

DATE 10/27/76                    488681                    E207-1703        035
                                          **NUMBER**

RECEIVED OF
     OR FILED BY   WILLIAM C. BUCKHAM

THE SUM OF $        50.00 FOR FILING FLF PER                              OF

COMMERCIAL LOVELACE MOTOR FREIGHT, INC.

RETURNED TO:                    55136                    FLF $        50.00
     WILLIAM C. BUCKHAM
     3400 REFUGEE RD.
     COLUMBUS, OH 43227
     c/o COMMERCIAL MOTOR FREIGHT INC.              TOTAL FEE $        50.00

NAME:
COMMERCIAL LOVELACE MOTOR FREIGHT, INC.



**THE STATE OF OHIO**

E207-1703

**DEPARTMENT OF STATE**

TED W. BROWN
Secretary of State

# Certificate

468601

**It is Hereby Certified** that the Secretary of State of Ohio has custody of the Records of Incorporation and Miscellaneous Filings; that said records show the filing and recording of: ___FLF PER_____ OF COMMERCIAL LOVELACE MOTOR FREIGHT, INC.

STATE OF INCORP: DE

TYPE OF LICENSE: PERMANENT

EXPIRATION DATE: VALID UNTIL CANCELLED FOR FAILURE TO FILE REPORTS



United States of America
STATE OF OHIO
Office of the Secretary of State

Recorded on Roll ___E207___ at Frame ___1703___ of the Records of Incorporation and Miscellaneous Filings.

Witness my hand and the seal of the Secretary of State, at the City of Columbus, Ohio, this ___20TH___ day of ___OCTOBER___, A. D. 19 ___76___.

_Ted W. Brown_

TED W. BROWN
Secretary of State

E0207-1703

C.100 Prescribed by Ted W. Brown,
Secretary of State
FOREIGN CORPORATION—FOR PROFIT

APPROVED
FOR FILING
By _____
Date 10/20/76
Amount $5.00

# Application for License

TO THE SECRETARY OF STATE, COLUMBUS, OHIO

COMMERCIAL LOVELACE MOTOR FREIGHT, INC. , a foreign corporation
desiring to transact business in Ohio, pursuant to the provisions of Sections 1703.01 et seq., Revised
Code of Ohio, does hereby certify as follows:

FIRST. Its corporate name is COMMERCIAL LOVELACE MOTOR FREIGHT, INC.

SECOND. It is a corporation organized under the laws of DELAWARE

THIRD. The complete address of its principal office outside the State of Ohio is

100 WEST TENTH STREET, WILMINGTON, DELAWARE 19801

FOURTH. The name of the county and city, village or township in which the principal office
within this State is to be located is FRANKLIN COUNTY, COLUMBUS, OHIO

FIFTH. It hereby constitutes and appoints WILLIAM C. BUCKHAM
a resident of the county wherein such principal Ohio office is to be located, as its agent
upon whom service of process may be had in the State of Ohio. The complete resi-
dence address of such person is 3400 REFUGEE ROAD

COLUMBUS, OHIO 43227

SIXTH. It hereby consents irrevocably to the service of process on such person and his suc-
cessors as long as the authority of such agents shall continue as provided by the Ohio
Foreign Corporation Act, and to service of process on the Secretary of State in the
event such person or persons cannot be found or in any of the other events whereby
such service is authorized by the Ohio Foreign Corporation Act.

SEVENTH. The following is a brief summary of the corporate purposes to be exercised
within Ohio: The corporation may engage in the business of trans-
portation of all kinds of freight of every kind and description, by motor
vehicle or any other means; conduct business in foreign, interstate and in-
trastate commerce, as a contract or common carrier of any other manner; engage
in all related businesses of all types including but not limited to owning,
leasing or operating all kinds of terminals, warehouses, garages and the sale
and leasing of all types of equipment including but not limited to trailers,
trucks, tractors, semi-trailers and all other types of motor and mechanically
propelled vehicles; and do all other acts necessary or desirable or inciden-
tal to accomplish the purposes herein.

EIGHTH. The corporation has, has not (Strike out words not applicable) had a prior license
to transact business within the State of Ohio

NINTH. This application is made, is not made (Strike out words not applicable) to enable
the corporation to prosecute or defend an action or suit the cause of which arose
prior to this application.

Page 3

E207-1703

**TENTH.** The approximate date upon which the corporation began transacting business in Ohio is __January 3, 1977__.

**ELEVENTH.** The application is made to secure a ████████, permanent (Strike out word not applicable) license.

**TWELFTH.** THERE IS HEREWITH SUBMITTED A Certificate of Good Standing or substistence, under the seal of the Secretary of State, or other proper official of the State under the laws of which the applicant is organized, setting forth: (1) The exact Corporate Title; (2) The date of incorporation; (3) That the Corporation is in good standing or is a subsisting corporation.

**THIRTEENTH.** The corporation has currently authorized a total of __500__ shares and has __100__ shares currently issued.

IN WITNESS THEREOF, said __William C. Buckham__ has caused this application to be executed by an executive officer duly authorized in the premises, this __26th__ day of __October__, 19__76__.

COMMERCIAL LOVELACE MOTOR FREIGHT, INC.

By _R. L. Ratchford_

(Title) PRESIDENT

STATE OF OHIO

COUNTY OF FRANKLIN

__ROBERT L. RATCHFORD__, being duly sworn, says that he is __PRESIDENT__ of the applicant and that the foregoing statements are true and correct according to his best knowledge and belief.

_Nancy B. Sheets_

Sworn to before me and subscribed in my presence this __26th__ day of __October__, 19__76__.

NOTARY PUBLIC

NANCY B. SHEETS
NOTARY PUBLIC, FRANKLIN COUNTY, OHIO
MY COMMISSION EXPIRES AUG. 19, 1981

Form C-302

E207-1703



# State
## of
# DELAWARE

### Office of SECRETARY OF STATE

*I, Robert H. Reed, Secretary of State of the State of Delaware,*

*do hereby certify* that the Certificate of Incorporation of the "COMMERCIAL LOVELACE MOTOR FREIGHT, INC.", was received and filed in this office the twenty-second day of September, A.D. 1976, at 10 o'clock A.M.;

And I do hereby further certify that the aforesaid Certificate of Incorporation is the only paper on record the Corporation in question not having filed an Amendment nor having made any change whatever in the original Cert'ficate as filed;

And I do hereby further certify that the aforesaid Corporation is duly incorporated under the laws of the State of Delaware and is in good standing and has a legal corporate existence not having been cancelled or dissolved so far as the records of this o ffice show and is duly authorized to transact business.

*In Testimony Whereof, I have hereunto set my hand and official seal at Dover this* twentieth *day of* October *in the year of our Lord one thousand nine hundred and* seventy-six.

Robert H. Reed          *Secretary of State*

Grover A. Biddle   *Assistant Secretary of State*

FORM 172

EXHIBIT "I"

JACK **SHAW,** TRUSTEE, Plaintiff, v. TIMOTHY **JENKINS,** dba DAN-RAY CONSTRUCTION CO., INC., et al., Defendants.

Case No. 2:99-CV-597

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF **OHIO,** EASTERN DIVISION

**159** F. Supp. 2d 995; 2001 U.S. Dist. LEXIS 22351

March 21, 2001, Filed

**DISPOSITION:** [**1] As it relates to the claim that defendant Paul **Jenkins** failed to make timely contributions for the period of September 1998 to October 1999, motion for summary judgment GRANTED. Plaintiff entitled to $ 4060.75 on this claim. Plaintiff's motion for summary judgment as it relates to Anthony Pink DENIED. As it relates to the request for injunctive relief, motion for summary judgment GRANTED. Plaintiff has also requested that the Court awarded him reasonable attorneys fees in the amount $ 3750.00.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee benefit trust fund trustee sued defendant individuals, seeking recovery, under the Labor-Management Relations Act of 1947 and the Employee Retirement Income Security Act of 1974, of amounts allegedly due certain employee benefit plans. The trustee sought recovery only against the individual who was the operator of the employer business. The trustee moved for summary judgment and for attorneys fees.

**OVERVIEW:** The business had been conducted by a corporation, the corporate charter of which had been canceled by the state in 1992. The trustee sought recovery of amounts related to required plan contributions that were not made. The unpaid contributions for one employee were for a period before revocation of the corporate charter, under a contract signed by the operator as president of the corporation. The magistrate judge found that, as to those contributions, the operator had never assumed the corporation's obligation personally. However, he was personally liable with respect to contributions that should have been made after the corporation's charter had been canceled and under a contract that the operator had thereafter signed. That contract was not an act of winding up corporate affairs, but was an undertaking of personal responsibility. The magistrate judge rejected the individuals' arguments that the trustee did not meet his burden of proof as to the amount of unpaid contributions, that the sum requested by the trustee differed from the amount claimed in the trustee's supporting memorandum, and that the employees for whom contributions had not been made were not identified.

**OUTCOME:** The court granted the trustee's motion for summary judgment in part, and denied it in part. The motion was granted as to claims for contributions due after employer's corporate charter was canceled, and as to injunctive relief. The court reserved judgment on the trustee's request for reasonable attorneys fees.

**CORE TERMS:** summary judgment, unpaid, laborer, canceled, corporate charter, liquidated damages, attorneys fees, winding, collective bargaining agreements, material fact, opposing party, burden of proof, personally, obligated, complain, cease, wind, employee benefit, employee benefit plans, pertinent part, genuine issue, personally responsible, new business, cancellation, partnership, shareholder, depositions, non-moving, incur, trust funds

Civil Procedure > Discovery > Methods > General Overview
Civil Procedure > Summary Judgment > Standards > General Overview
Civil Procedure > Summary Judgment > Supporting Materials > General Overview
*HN1* ± See Fed. R. Civ. R. 56(c).


Civil Procedure > Summary Judgment > Standards > Appropriateness
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Materiality
*HN2* ± Pursuant to Fed. Civ. P. 56(c), summary judgment is appropriate if there is no genuine issue as to any material fact. In making this determination, the evidence must be viewed in the light most favorable to the non-moving party. Summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party.


Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview
Civil Procedure > Summary Judgment > Opposition > General Overview
Civil Procedure > Summary Judgment > Standards > General Overview
*HN3* ± Summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party.


Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Costs & Attorney Fees > Court Costs
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Liquidated Damages
*HN4* ± Section 502 of the Employee Retirement Income Security Act of 1974, codified at 29 U.S.C.S. § 1132, creates . cause of action to enforce employer contributions to employee benefit funds, and requires an award of interest and the greater of liquidated damages or double interest as well as attorneys fees and costs.


Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Delinquent Contributions
*HN5* ± See 29 U.S.C.S. § 1132(g)(2).


Labor & Employment Law > Employment Relationships > At-Will Employment > Employers
Pensions & Benefits Law > Employee Benefit Plans > General Overview
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > General Overview


Ohio Corporation Continues Existence To Wind Up Its Affairs

**HN6 ⬇** See 29 U.S.C.S. § 1002(5).

Business & Corporate Law > Joint Ventures > Formation
Contracts Law > Types of Contracts > Joint Contracts
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > General Overview

**HN7 ⬇** The term "person," as used in 29 U.S.C.S. § 1002(5), means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization. 29 U.S.C.S. § 1002(9).

Business & Corporate Law > Corporations > Dissolution & Receivership > Termination & Winding Up > General Overview

**HN8 ⬇** See **Ohio** Rev. Code Ann. § 1701.88(A).

Business & Corporate Law > Corporations > Finance > Franchise Tax > Penalties for Noncompliance
Business & Corporate Law > Corporations > Formation > Corporate Existence, Powers & Purpose > Powers > General Overview
Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview

**HN9 ⬇** Under **Ohio** Rev. Code Ann. § 1701.88(A) of the Corporation Act, the authority granted to a corporation by law is removed by the legislature for all purposes except such as are necessary to wind up its affairs. Thus, where a corporate charter is canceled for non-payment of franchise taxes, the corporation does not cease to exist but remains a de jure corporation at least for the limited purpose of winding up its corporate affairs. The firm proscription in the Corporation Act, accompanied by authority for only a limited purpose, indicates an intention of the legislature to withdraw the power of such corporation and not to tolerate the use of lapsed corporations by individuals as a shield for continuing business.

Business & Corporate Law > Corporations > Dissolution & Receivership > Termination & Winding Up > General Overview

**HN10 ⬇** Under **Ohio** Rev. Code Ann. § 1701.88(A) of the general Corporation Act, when the articles of a corporation are canceled, whether by the Secretary of State or otherwise, the authority of the corporation to do business ceases, and after such termination, officers who carry on new business do so as individuals, lose the protection of the Corporation Act, and are personally responsible for such obligations as they incur.

Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Delinquent Contributions
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Claim Procedures
Pensions & Benefits Law > Multiemployer Plans > General Overview

**HN11 ⬇** 29 U.S.C.S. § 1145 applies only to an employer who is obligated to make contributions to a multi-employer plan.

Business & Corporate Law > General Partnerships > Dissolution & Winding Up > Dissolution > General Overview
Business & Corporate Law > General Partnerships > Dissolution & Winding Up > Winding Up > Accounting
Business & Corporate Law > General Partnerships > Dissolution & Winding Up > Winding Up > Distribution of Assets

*HN12* ⬥ Under **Ohio** law, whether a contract was part of the process of winding up is a different issue than whether the corporation continued to exist. "Winding up" is the process of settling the accounts and liquidating the assets of a partnership or corporation, for the purpose of making distribution of net assets to shareholders or partners and dissolving the concern.

Business & Corporate Law > Corporations > Dissolution & Receivership > Termination & Winding Up > General Overview

*HN13* ⬥ Entering into new contracts is not an act of winding up corporate affairs. Thus, under **Ohio** law, the officers of the corporation who carry on new business do so as individuals and are personally responsible for such obligations as they incur.

Civil Procedure > Summary Judgment > Time Limitations
Pensions & Benefits Law > Employee Retirement Income Security Act (ERISA) > Civil Claims & Remedies > Causes of Action > Delinquent Contributions

*HN14* ⬥ Requiring a defendant to timely report the hours worked by each laborer in his employ through the expiration of applicable collective bargaining agreements and to timely pay the contributions owed to the funds based on those hours is relief clearly authorized by the Employee Retirement Income Security Act of 1974. 29 U.S.C.S. § 1132(g)(2)(E).

**COUNSEL:** For JACK **SHAW**, Trustee, plaintiff: Steven Louis Ball, Ball Noga & Tanoury, Columbus, **OH.**

For TIMOTHY **JENKINS**, PAUL NMI **JENKINS**, defendants: Joseph P McCafferty, McCafferty & Williams, Cleveland, **OH.**

For TIMOTHY **JENKINS**, PAUL NMI **JENKINS**, defendants: Andrew P Cooke, Browning & Cooke, Columbus, **OH.**

**JUDGES:** Norah McCann King, United States Magistrate Judge.

**OPINION BY:** Norah McCann King

**OPINION**
**[*997] OPINION AND ORDER**

Plaintiff brings this action under the Labor-Management Relations Act of 1947, 29 U.S.C. § 185, as well as the Employee Retirement Income Security Act of 1974 ["ERISA"], 29 U.S.C. § 1132 et seq., seeking recovery of amounts allegedly [**2] due certain employee benefit plans. Upon the consent of the parties, 28 U.S.C. § 636(c), this matter is before the Court on plaintiff's motion for summary judgment.
**I. Background**

Plaintiff is a trustee of the **Ohio** Laborers' Fringe Benefit Programs ["Programs"], which is an association of four trust funds: the labor management cooperative trust known as **Ohio**

Laborers' District Council-**Ohio** Contractors Association Cooperation and Education Trust, and three employee benefit trust funds known as **Ohio** Laborers' District Council-**Ohio** Contractors' Association Insurance Fund, **Ohio** Laborers' Training and Upgrading Fund, Laborers' District Council, and Contractors' Pension Fund of **Ohio** ["the funds"]. (*Complaint*, P 2). Plaintiff names as defendants Timothy and Paul **Jenkins,** alleged to be doing business as Dan-Ray Construction Company, Inc. ["Dan-Ray"]. The business itself, which is located in Cleveland, **Ohio**, *Id.*, P 3, has not been named as a defendant. It is alleged that, on December 15, 1992, the **Ohio** Secretary of State canceled Dan-Ray's corporate charter. *Id.* Plaintiff seeks recovery of unpaid contributions to the funds, as well as interest, [**3] liquidated damages and attorneys fees against only defendant Paul **Jenkins.**

## II. Discussion

### A. Standard

Fed. R. Civ. R. 56(c) provides in pertinent part:

*HN1* The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*HN2* Pursuant to <u>Fed. R. Civ. P. 56(c)</u>, summary judgment is appropriate if "there is no genuine issue as to any material fact . . . ." In making this determination, the evidence must be viewed in the light most favorable to the non-moving party. <u>*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970)</u>. Summary judgment will not lie if the dispute about a material fact is genuine, "that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." <u>*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)</u>. However, *HN3* summary judgment is appropriate if the opposing party fails to make a showing [**4] sufficient to establish the existence of an element essential to that party's case and on which that party wi'l bear the burden of proof at trial. <u>*Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)</u>. The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. <u>*Anderson*, 477 U.S. at 251</u>.

### B. Application

Plaintiff contends that summary judgment is appropriate in regard to the claim relating to the period September 1998 to October 1999 and the claim relating to [*998] employee Anthony Pink. In support of his motion for summary judgment, plaintiff provides evidence demonstrating that the **Ohio** Secretary of State canceled Dan-Ray's corporate charter on December 15, 1992. *Exhibit A Attached to Plaintiff's Motion for Summary Judgment.* Plaintiff also attaches an agreement signed by Paul **Jenkins** on October 15, 1985 in his capacity as president of Dan-Ray, *Exhibit B Attached to Plaintiff's Motion for Summary Judgment*, and two agreements signed by Timothy **Jenkins** on June 23, 1994, [**5] *Exhibits B, C Attached to Plaintiff's Motion for Summary Judgment*, which agreements purport to obligate Dan-Ray to contribute to the funds on behalf of certain employees. Plaintiff also attaches documentation setting forth the principal amounts of the unpaid contributions, the employees on whose behalf the contributions were not paid, the dates of the unpaid contributions, the interest that has accrued on the unpaid contributions, and the amount of liquidated damages for the principal amounts of the unpaid contributions. *Exhibits E, F, H Attached to Plaintiff's Motion for Summary Judgment.*

Defendants contend that plaintiff has failed to meet his burden of proof because plaintiff failed to present evidence that defendants Paul and Timothy **Jenkins** were personally obligated to contribute to the funds. Defendants also maintain that plaintiff failed to identify,

with the exception of Anthony Pink, the employees on whose accounts contributions were left unpaid, the dates of the contributions that defendants allegedly failed to pay, and the manner in which the unpaid contributions were calculated. Furthermore, defendants argue that contributions were not required in regard to Anthony [**6] Pink, the one employee specifically named by plaintiff, because he was employed as a security guard during the period from June 1989 to November 1990, not as a laborer.

**HN4** Section 502 of ERISA, 29 U.S.C. § 1132, creates a cause of action to enforce employer contributions to employee benefit funds, and requires an award of interest and the greater of liquidated damages or double interest as well as attorneys fees and costs. [1] Moreover, the collective bargaining agreements documented by plaintiff provide for liquidated damages of 10% of any late principle contributions, plus interest in the amount of 1% per month on late contributions.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

1 Section 502 provides:

**HN5** (2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan--

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of--
(I) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

For purposes of this paragraph, interest on unpaid contributions shall be determined by using the rate provided under the plan, or, if none, the rate prescribed under section 6621 of Title 26. 29 U.S.C. § 1132(g)(2).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

## [**7] 1. Defendant Paul Jenkins' Personal Liability for the Unpaid Contributions

In their memorandum *contra* plaintiff's motion for summary judgment, defendants complain that plaintiff has not established that defendants Paul and Timothy Jenkins were personally obligated to contribute to the funds. Plaintiff has "attached signed [*999] agreements, all of which incorporate the **Ohio** Highway-Heavy-Municipal and Utility Contract between the **Ohio** Contractors Association and the Laborers' District Council of **Ohio,** and all of which require contributions to the Plaintiff Funds." *Plaintiff's Memorandum in Reply to Defendants' Memorandum contra Plaintiff's Motion for Summary Judgment,* at 4. However, the agreements presented by plaintiff expressly state that the parties to the agreements were local unions affiliated with the Laborer's District Council of **Ohio,** AFL-CIO ["Union"] and Dan-Ray. *Exhibits B, C, and D attached to Plaintiffs' Motion for Summary Judgment.* In 1985, defendant Paul **Jenkins** -- the only defendant against whom plaintiff currently seeks summary judgment -- signed one such agreement as the president of Dan-Ray. *Exhibit B attached to Plaintiff's Motion for Summary Judgment* [**8] . In 1994, Timothy **Jenkins** signed the other two collective bargaining agreements without expressly stating his capacity. *Exhibits C, D attached to Plaintiff's Motion for Summary Judgment.* Plaintiff also presents evidence that Dan-Ray's corporate status was canceled by the Secretary of State

on December 15, 1992. *Exhibit A attached to Plaintiff's Motion for Summary Judgment*. The Court must determine whether plaintiff may hold defendant Paul **Jenkins** personally liable to the funds for the unpaid contributions.

Under ERISA, the [HN6]"term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." <u>29 U.S.C. § 1002(5)</u>. [HN7]The term "person," as used in <u>§ 1002(5)</u>, "means an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." <u>29 U.S.C. § 1002(9)</u>.

In <u>*Eversman v. Ray Shipman Co.*, 115 **Ohio** St. 269, 152 N.E. 643 (1926)</u>, the **Ohio** Supreme [**9] Court concluded that transactions of a corporation occurring after the cancellation of its corporate charter are not void. [2] However, the *Eversman* decision was based on an analysis of certain tax statutes and pre-dated the **Ohio's** Corporation Act, which provides, in pertinent part:

[HN8]When a corporation is dissolved voluntarily or when the articles of a corporation have been canceled or when the period of existence of the corporation specified in its articles has expired, the corporation shall cease to carry on business and shall do only such acts as are required to wind up its affairs, but for such purpose it shall continue as a corporation.

<u>O.R.C. § 1701.88(A)</u>. [HN9]"Under this section of the Corporation Act, the authority granted to a corporation by law is removed by the legislature for all purposes except such as are necessary to wind up its affairs." <u>*Chatman v. Day*, 7 **Ohio** App. 3d 281, 282, 455 N.E.2d 672 (Montgomery Cy. 1982)</u>. Thus, where a corporate charter is canceled "for non-payment of franchise taxes, the corporation does not cease to exist but remains a *de jure* corporation at least for the limited purpose of winding [*1000] up its corporate affairs [**10] . . . ." <u>*Columbia Real Estate Title Ins. Co. v. Columbia Title Agency, Inc.*, 11 **Ohio** App. 3d 284, 465 N.E.2d 468</u>, syllabus (Franklin Cy. 1983). *See also* <u>*Thomas v. Price*, 133 **Ohio** App. 3d 585, 589, 729 N.E.2d 427 (Hamilton Cy. 1999)</u>; <u>*Monteith v. Kline*, 1992 **Ohio** App. LEXIS 3283</u>, No. 15374, 1992 WL 150281, at *2 (Summit Cy. Ct. App. June 24, 1992). "The firm proscription in the Corporation Act, accompanied by authority for only a limited purpose, indicates an intention of the legislature to withdraw the power of such corporation and not to tolerate the use of lapsed corporations by individuals as a shield for continuing business . . . ." <u>*Chatman*, 7 **Ohio** App. 3d at 282</u>.

[HN10]Under <u>R.C. 1701.88(A)</u> of the general Corporation Act, when the articles of a corporation are canceled, whether by the Secretary of State or otherwise, the authority of the corporation to do business ceases and after such termination officers who carry on new business do so as individuals, lose the protection of the Corporation Act, and are personally responsible for such obligations as they incur.

*Id. See also* <u>*Sheehan v. McRedmond*, 1998 **Ohio** App. LEXIS 5311</u>, No. 73358, 1998 WL 774983, at *2 (Cuyahoga Cy. Ct. App. Nov. 5, 1998); [**11] <u>Consolidated Freightways Corp. v. Allred</u>, 1991 **Ohio** App. LEXIS 6045</u>, No. 91- AP-747, 1991 WL 268743, at *1 (Franklin Cy. Ct. App. Dec. 10, 1991).

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

2 Although courts have interpreted *Eversman* as holding that "cancellation of a corporate charter pursuant to G.C. 5509 (the predecessor to <u>O.R.C. § 5733.20</u>) does not have the effect of terminating all corporate powers of the corporation," <u>*Columbia Real Estate Title Ins. Co v. Columbia Title Agency, Inc.*, 11 **Ohio** App. 3d 284, 286, 465 N.E.2d 468 (Franklin Cy. 1983)</u>, this Court does not read *Eversman* as limiting the authority of a corporation to only those acts necessary to wind up its affairs. *See also* <u>*Eleanore Bld'r, Inc. v. United States*, 826 F. Supp. 1111, 1115 (N.D. **Ohio** 1993)</u>.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The allegedly unpaid contributions relating to Anthony Pink were for the period June 1989 to November 1990. The agreement covering this time period was signed by Paul **Jenkins**, in his capacity as president of the corporation, [**12] on October 15, 1985. *Exhibit B attached to Plaintiff's Motion for Summary Judgment.* Given that Dan-Ray's corporate charter was not canceled until December 15, 1992, *Exhibit A attached to Plaintiff's Motion for Summary Judgment,* and defendant Paul **Jenkins** appears to have been acting on behalf of the corporation when he signed the agreement obligating it to contribute to the funds, the Court concludes that the Union and the corporation were parties to the 1985 collective bargaining agreement. Because *HN11*☞ 29 U.S.C. § 1145 "applies only to an employer who is 'obligated to make contributions' to a multi-employer plan--and the individual defendant had never assumed any such obligation himself[,]" *Scarbrough v. Perez, 870 F.2d 1079, 1083 (6th Cir. 1989),* the Court concludes that plaintiff's motion for summary judgment against defendant Paul **Jenkins** lacks merit in regard to the unpaid contributions concerning Anthony Pink.

In regard to the allegedly unpaid contributions for the period September 1998 to October 1999, the Court notes that plaintiff has presented uncontroverted evidence that Dan-Ray's corporate charter had been canceled by the Secretary [**13] of State by that time. *Exhibit A Attached to Plaintiff's Motion for Summary Judgment.* Thus, after December 15, 1992, Dan-Ray continued to exist only for the purpose of winding up its affairs. *See O.R.C. § 1701.88(A).*

*HN12*☞"Whether [a] contract was part of the process of winding up is a different issue than whether the corporation continued to exist." *Monteith, 1992 Ohio App. LEXIS 3283, 1992 WL 15374,* at *2. "'Winding up' is the process of settling the accounts and liquidating the assets of a partnership or corporation, for the purpose of making distribution of net assets to shareholders or partners and dissolving the concern." *Consolidated Freightways Corp. v. Allred, 1991 Ohio App. LEXIS 6045,* No. 91- AP-747, 1991 WL 268743, at *1 (Franklin Cy. Dec. 10, 1991). Plaintiff has presented as evidence two agreements which were signed by Timothy **Jenkins** on June 23, 1994, and which name the Union and Dan-Ray as parties. *Exhibits C, D Attached to Plaintiff's Motion for Summary Judgment.* [*1001] *HN13*☞Entering into new contracts, *i.e.,* the 1994 agreements, is not an act of winding up corporate affairs. Thus, the officers of the corporation "who carry on new business do so as individuals . . . and are personally [**14] responsible for such obligations as they incur." *Chatman, supra, 7 Ohio App. 3d at 282.* The record contains evidence that defendant Paul **Jenkins** is the president and sole shareholder of Dan-Ray and carries out the managerial functions of the business. *Exhibit K, Deposition of Timothy Jenkins,* at 5-7. The Court finds this evidence sufficient to establish that defendant Paul **Jenkins** is the operator of the business and is an "employer" for purposes of ERISA.

**2. Remaining Issues**

Defendants argue that plaintiff has failed to meet his burden of proof because he failed to describe or identify the manner in which the audit for the period September 1998 to October 1999 was completed, the employees for whom contributions were allegedly unpaid, the dates the allegedly unpaid contributions were due, and the manner in which the unpaid contributions were calculated. In regard to plaintiff's claim that the funds are entitled to $ 24,949.34 in unpaid contributions, liquidated damages, and interest, defendants argue that, although plaintiff refers to several different figures in the memorandum in support of the motion for summary judgment, the sum of these figures does not [**15] total the requested amount.

The Court notes that, although defendants complain that they do not have information sufficient to enable them to either evaluate or dispute plaintiff's assertions in this regard,

they have not utilized the procedures available to them under Fed. R. Civ. P. 56(f). The Court is not persuaded by defendants' complaint in this regard. *See Cacevic v. City of Hazel Park*, 226 F.3d 483 (6th Cir. 2000).

The Court next addresses defendants' argument that the figures cited by plaintiff in the memorandum in support of the motion for summary judgment do not total the sum requested by plaintiff, $ 24,949.34. Given that the Court concluded that plaintiff was not entitled to the amounts sought in relation to the claim concerning Anthony Pink, the Court must only consider the amounts sought by plaintiff in regard to the allegedly unpaid contributions for the period September 1998 to October 1999. While it is true that plaintiff transposed the numbers comprising one of the figures for liquidated damages, this figure was in regard to the unpaid contributions for Anthony Pink; therefore, defendants' argument is moot.

In regard to plaintiff's claim concerning [**16] the allegedly unpaid contributions for the period September 1998 to October 1999, defendants also complain that plaintiff failed to proffer evidence identifying the employees on whose behalf contributions were unpaid and the dates of the allegedly unpaid contributions. Defendants' complaints are not supported by the record. Plaintiff presented evidence documenting the names of the employees in question, *Exhibits E Attached to Plaintiff's Memorandum in Support of the Motion for Summary Judgment*, and the dates on which contributions were allegedly due. *Id.* In short, the Court concludes that the undisputed record indicates that plaintiff is entitled to judgment in the principle amounts sought in relation to the unpaid contributions for the period September 1998 to October 1999.

Plaintiff also asks that this Court [HN14]➔require defendant Paul **Jenkins** to timely report the hours worked by each laborer in his employ through the expiration of the collective bargaining agreements and to timely pay the contributions owed to the funds based on those hours. ERISA [*1002] clearly authorizes such relief. 29 U.S.C. § 1132(g)(2)(E).

**III. Conclusion**

As it relates to the [**17] claim that defendant Paul **Jenkins** failed to make timely contributions for the period of September 1998 to October 1999, the motion for summary judgment is **GRANTED**. Plaintiff is entitled to $ 4060.75 on this claim. Plaintiff's motion for summary judgment as it relates to Anthony Pink is **DENIED**.

As it relates to the request for injunctive relief, the motion for summary judgment is **GRANTED**.

Plaintiff has also requested that the Court award him reasonable attorneys fees in the amount $ 3750.00. Although plaintiff's counsel provides affidavits detailing the time spent on this action, he does not distinguish between the time spent on the claim on which plaintiff prevailed, and that on which summary judgment was denied. The parties have ten (10) days in which to supplement their memoranda concerning the issue of attorneys fees.

Norah McCann King

United States Magistrate Judge

# EXHIBIT "J"

**ELEANORE** BUILDERS, INC., Plaintiff, v. UNITED STATES OF AMERICA, Defendant

CASE NO. 1:91CV0663

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF **OHIO,** EASTERN DIVISION

**826** F. Supp. 1111; 1993 U.S. Dist. LEXIS 6227; 93-2 U.S. Tax Cas. (CCH) P50,426; 71 A.F.T.R.2d (RIA) 1903

April 30, 1993, Filed

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff taxpayer and defendant federal government filed cross-motions for summary judgment in the taxpayer's action claiming that it overpaid its taxes.

**OVERVIEW:** The taxpayer, corporation, was engaged in the construction and ownership of commercial real estate. The taxpayer's state charter was cancelled by a state taxation department for failure to pay franchise taxes. Thereafter, the federal government assessed penalties against the taxpayer for late filing of partnership returns. The taxpayer filed an action against the government, claiming that it overpaid taxes and was entitled to recover those sums. The taxpayer asserted that it became a partnership for federal income tax purposes when its state charter was cancelled. The parties filed cross motions for summary judgment. The court found that the corporation had centralized management. The court also found that there were no restrictions upon the transferability of the shareholders' interests. The court held that the taxpayer continued to operate as a corporation even though its charter was terminated. Therefore, the court concluded that the taxpayer was not entitled to summary judgment.

**OUTCOME:** The court denied the taxpayer's motion for summary judgment. The court granted the government's motion for summary judgment.

**CORE TERMS:** partnership, shareholder, charter, transferability, cancellation, stock, summary judgment. transferred, cancelled, tax purposes, exclusive authority, taxation, refund, elected, failure to pay, franchise taxes, corporate charter, continuity, revoked, divide, corporate income tax returns, dissolution, accountant, state charter, purposes of taxation, corporate tax returns, centralization, centralized, classified, entity

### LexisNexis® Headnotes Hide Headnotes

Business & Corporate Law > Corporations > Formation > Place of Incorporation > General Overview
*HN1* ⬇ Whether a corporation has been formed is a question of state law.

Business & Corporate Law > Corporations > General Overview
Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Causes of Action > General Overview

Ohio Corporation Continues Its Existence To Wind Up Its Affairs

Business & Corporate Law > General Partnerships > Management Duties & Liabilities > Rights of Partners > General Overview

*HN2* ↓ 26 CFR § 301.7701-2(a) provides: Characteristics of corporations. (1) The term "association" refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust. There are a number of major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organizations. These are: (i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be classified as an association must be determind by taking into account the presence or absence of each of these corporate characteristics. The presence or absence of these characteristics will depend upon the facts in each individual case. In addition to the major characteristics set forth in this subparagraph other factors may be found in some cases which may be significant in classifying an organization as association, partnership, or a trust. An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust.

Tax Law > Federal Taxpayer Groups > C Corporations > Earnings & Profits (IRC secs. 312, 316) > General Overview

*HN3* ↓ A corporation is subject to federal corporate tax as long as it continues to do business in a corporate manner even though its corporate charter has been revoked by a state.

Tax Law > Federal Taxpayer Groups > C Corporations > Reorganizations (IRC secs. 351-368, 381-384)

*HN4* ↓ 26 CFR 301.7701-2(c) states that an organization has centralized management if any person has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed.

Tax Law > Federal Taxpayer Groups > C Corporations > Reorganizations (IRC secs. 351-368, 381-384)

*HN5* ↓ An organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation or expulsion of any member will not cause dissolution of the organization.

Tax Law > Federal Taxpayer Groups > C Corporations > Reorganizations (IRC secs. 351-368, 381-384)
Tax Law > Federal Taxpayer Groups > S Corporations > Conditions & Restrictions (IRC sec. 1361)

*HN6* ↓ 26 CFR 301.7701-2(e)(1) An organization has the corporate characteristic of free transferability of interests if each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of the other members, to substitute for themselves in the same organization a person who is not a member of the organization.

Tax Law > Federal Tax Administration & Procedure > Tax Credits & Liabilities > Interest (IRC secs. 6601-6631) > General Overview

Tax Law > Federal Taxpayer Groups > C Corporations > Reorganizations (IRC secs. 351-368, 381-384)

HN7 ⊥ 26 CFR § 301,6601-2(d)(1) An organization has the characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. Personal liability means that a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim.

Tax Law > State & Local Taxes > Administration & Proceedings > Failure to Pay Tax
Tax Law > State & Local Taxes > Franchise Tax > Failure to Pay Tax
Tax Law > State & Local Taxes > Income Tax > Corporations & Unincorporated Associations > General Overview

HN8 ⊥ In Ohio, a corporation whose charter is terminated for failure to pay franchise taxes continues to be a corporation. A shareholder of such corporation still has limited liability.

**JUDGES:** [**1] White

**OPINION BY:** GEORGE W. WHITE

**OPINION**

[*1111] HON. GEORGE W. WHITE

*MEMORANDUM AND ORDER*

This is an action for the refund of income taxes brought under 26 U.S.C. §§ 7421 and 7422. The Plaintiff, **Eleanore** Builders was an **Ohio** Corporation whose state charter was cancelled by the **Ohio** Department of Taxation on May 14, 1982 for failure to pay franchise taxes. Plaintiff alleges that the Corporation became a partnership for tax purposes when its charter was revoked. However, Corporate Tax Returns were filed from 1974, to 1989. Subsequently, **Eleanore** Builders filed Partnership Returns for 1982, 1983 and 1985 through 1988. On July 1, 1990 a penalty was assessed for late filing of the Partnership Returns for 1982 through 1988. The penalty of $ 3505.30 was paid. Plaintiff claims it overpaid its taxes for the years mentioned and is entitled to recover those sums. The action was placed on the expedited track and the parties agreed that a trial would be unnecessary. As a result the parties have filed cross-motions for summary judgment. The issue is whether **Eleanore** Builders became a partnership for federal income tax purposes when its state charter was cancelled by the **Ohio** [**2] Department of Taxation.

The following facts are undisputed. **Eleanore** Builders, Inc. (hereafter Builders) was incorporated on August 21, 1954 and its principal office was located in Euclid, **Ohio**. Builders was engaged in the construction and ownership of commercial real estate. The initial officers of Builders were Frank Kapel (President), Richard C. Hoge (Vice President), and Charles J. Seifert (Secretary/Treasurer). [*1112] These individuals were also directors of Builders.

Of the initial offering of one-hundred (100) shares of Builders' stock, Frank Kapel purchased eighty (80) shares and Richard Hoge and Charles Seifert each purchased ten (10) shares. On October 8, 1955, Richard Hoge resigned as Vice-President and a director of Builders, transferred his ten (10) shares of stock back to Builders and Milan Kapel (Frank Kapel's brother) became Vice-President and a director and obtained ten (10) shares of Builders'

stock. There are no restrictions on the transferability of the shareholders' interests in Builders.

On April 30, 1957, Milan Kapel was elected President of Builders, Frank Kapel was elected Vice-President and Treasurer and Sylvia Delligatti was elected Secretary. Charles Seifert [**3] also resigned as a director on that date an transferred his ten (10) shares back to Builders. Milan Kapel obtained Mr. Seifert's ten (10) shares of Builders' stock.

According to the Plaintiff, no shareholders' or directors' meetings were held after January 1, 1978. In 1970, Frank Kapel died and his eighty (80) shares of Builders' stock were transferred to his e¬tate and then to his wife Stephanie Kapel. Frank Kapel's death did not cause a dissolution of Builders. On November 24, 1971, **Eleanore** Kapel (Milan Kapel's wife) was elected Secretary of Builders and in 1972 she also became a director. On May 14, 1982, Builder's charter was cancelled by the **Ohio** Department of Taxation for its failure to pay franchise taxes. At the time of said cancellation, the two stockholders of Builders were Stephanie Kapel (80%) and Milan Kapel (20%). Following the May 14, 1982 cancellation of Builders' charter, the operations and management of Builders remained the same. Following the cancellation of the charter, no partnership agreement was ever executed, and, in fact, at no time between 1982 and 1988 did the owners of Builders ever express or otherwise manifest an intention to change the organizational [**4] form of Builders to a partnership. During the years 1982 through 1988, Builders had a business objective (i.e., an objective to carry on business and divide the gains therefrom).

After the cancellation of the corporate charter, Builders **continued** to hold itself out to the public as a corporation. As set forth in the Forms 1120, from 1983 through 1988, Builders had assets in excess of $ 400,000.00. Also, from 1982 through 1985, Builders owned and maintained buildings, made leasehold improvements, and collected rents. In 1986, 1987 and 1988, Builders had a personal holding company which collected rent, recognized capital gains and earned si¬nificant interest income. The Form 1120 for 1988 reflects $ 528,103 in corporate assets and $ 124,075 in interest income of the personal holding company.

According to the 1983 Form 1120, sometime in 1983, Builders sold real property located at 25000 Euclid Avenue, Euclid, **Ohio,** and recognized a gain of $ 232,696. Checks written by Builders describe Builders as a corporation by using the name "**Eleanore** Builders, Inc." The authorized signatories on the Builders' bank accounts from 1982 through 1988 were Milan Kapel, Sr., **Eleanore** Kapel, Marianne [**5] Kapel, and Milan Kapel, Jr. From 1954 until his death on October 16, 1984, Milan Kapel, controlled the management and day-to-day operations of Builders and had continuing exclusive authority to make the management decisions of Builders. Milan Kapel's death did not cause a dissolution of Builders. Following Milan Kapel's death, **Eleanore** Kapel, acting as resident of Builders, had continuing exclusive authority to make the management decisions and the operations and management of Builders did not change. Following Milan Kapel's death, Stephanie Kapel remained 80% shareholder of Builders and the Estate of Milan Kapel and/or **Eleanore** Kapel was the owner of the balance of the 20% interest in Builders. According to the Affidavit of **Eleanore** Kapel (Kapel Affidavit), following Milan Kapel's death, she discovered that Builders had not filed corporate income tax returns for any year after 1973. On October 29, 1986, **Eleanore** Kaþel, acting as President of Builders, executed an Agreement of Sale of Real Estate, thereby selling the real property located at 7450 North Center Street, Mentor, **Ohio,** for $ 195,000.00. On February 27, 1987, **Eleanore** Kapel signed an Agreement relating to [*1113] the [**6] sale of real property on behalf of Builders, as President. Said Agreement states, inter alia, that Builders is an **Ohio** Corporation "in good standing in accordance with the laws of the State of **Ohio** as a corporation." Builders currently holds

title to land in Madison, **Ohio,** which Plaintiff alleges to be worth $ 210,000. This action was brought, in part, to prevent the sale of that property by the IRS.

According to the Kapel Affidavit, between November of 1984 and June of 1987, she engaged the services of a certified public accountant to prepare all the delinquent corporate income tax returns of Builders. That accountant did not perform the requested services and **Eleanore** Kapel retained a second accountant who completed all the delinquent returns before December 31, 1988. On or about January 17, 1989, Builders filed U.S. Corporate Income Tax Returns (IRS Forms 1120), for the calendar years 1982 through 1987. Said corporate tax returns were signed and filed by **Eleanore** Kapel as President of Builders. Apparently, on December 8, 1989, **Eleanore** Kapel learned that the Articles of Incorporation had been cancelled by the State of **Ohio.** It was not until December 29, 1989, that Builders claimed [**7] to be a partnership and, hence, exempt from corporate income taxes. Builders made such a claim by filing amended corporate returns (IRS Forms 1120X) and U.S. Partnership Returns of Income (IRS Forms 1065) for the years 1982 through 1988.

Builders' unpaid corporate income tax liabilities, with respect to periods initially in issue in the Complaint, are as follows:

| Period | Unpaid Assessed Balance Due * |
|--------|-------------------------------|
| 1982   | $ 0.00                        |
| 1983   | $ 31,888.83                   |
| 1985   | $ 6,027.44                    |
| 1986   | $ 16,176.53                   |
| 1987   | $ 1,606.08                    |
| 1988   | $ 19,469.94                   |

Plaintiff's Complaint initially sought recovery of the following amounts paid with respect to the following periods:

| Period | Amount Claimed by Plaintiff | Count in Complaint |
|--------|------------------------------|--------------------|
| 1982   | $ 726.00                     | III                |
| 1983   | $ 71,257.00                  | IV                 |
| 1985   | $ 14,511.00                  | V                  |
| 1986   | $ 43,116.00                  | VI                 |
| 1987   | $ 5,736.00                   | VII                |
| 1988   | $ 23,491.00                  | VIII               |

On November 9, 1992, the Court entered an Agreed Order whereby Plaintiff dismissed, without prejudice, those aspects of the Complaint that relate to the requests for refunds of federal taxes for the years 1983, 1985, 1986, 1987 and 1988. Thus, only the claim for refund with respect to the 1982 period remains in this suit. However, Plaintiff has indicated that a determination [**8] by the Court that Builders did not become a partnership after the cancellation of the charter in 1982, as alleged by Plaintiff, would act to resolve that issue for the later years.

The Plaintiff contends that because its charter was cancelled it became a partnership and that it is entitled to a refund of its tax payments. The definition of a corporation includes associations, joint-stock companies and insurance companies. 26 U.S.C. § 301.7701(a)(3). [HN1]Whether a corporation has been formed is a question of state law. *United States v. Young,* 604 F. Supp. 164, 170 (ND Okla. 1984). But federal law determines whether the corporate entity should be disregarded for federal tax purposes. *Id.* 26 CFR 301.7701-1(b) provides:

The Internal Revenue Code prescribes certain categories, or classes, into which various organizations fall for purposes of taxation. These categories, or classes, include associations (which are taxable as corporations),

partnerships, and trusts. The tests, or standards, which are to be [*1114] applied in determining the classification in which an organization belongs (whether it is an association, a partnership, [**9] a trust, or other taxable entity) are detained under the Internal Revenue Code. Sections 301.7701-2 301.7701-4 set forth these tests, or standards, which are to be applied in determining whether an organization is (1) an association (see at 301.7701-2), (2) a partnership (see at 301.7701-3), or (3) a trust (see at 301.7701.4).

The Treasury Regulations set forth a test for determining whether an organization is taxable as a corporation. **HN2** 26 CFR § 301.7701-2(a) provides:

Characteristics of corporations. (1) The term "association" refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or a trust. There are a number of major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organizations. These are: (i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be clarified [**10] as an association must be determined by taking into account the presence or absence of each of these corporate characteristics. The presence or absence of these characteristics will depend upon the facts in each individual case. In addition to the major characteristics set forth in this subparagraph other factors may be found in some cases which may be significant in classifying an organization as association, partnership, or a trust. An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See Morrissey et al. v. Commissioner, (1935) 296 U.S. 344, 80 L. Ed. 263, 56 S. Ct. 289 . Centralization of management, continuity of life, free transferability of interests and limited liability are key characteristics. 26 CFR § 301.7701-2(a)(2).

It has been held that **HN3** a corporation is subject to federal corporate tax as long as it continues to do business in a corporate manner even though its corporate charter has been revoked by the state. Messer v. C.I.R, 438 F.2d 774, 778 (3rd Cir. 1971); United States v. Young, 604 F. Supp. at 170. [**11] The Court in Outlaw v. United States, 204 Ct. Cl. 152, 494 F.2d 1376 (Ct. Cl. 1974) stated:

[3] We have already pointed out that the existence of associates and a business objective are the only two characteristics required by the Regulations before an organization will be considered an association. Consequently, if the organization has two or more of the four remaining corporate characteristics, making a total of four or more of the six listed in the Regulations, it will be treated as an association taxable as a corporation. Id. at 1385.

**Eleanore** Builders had associates and a business objective. From 1982 to 1988 it had two shareholders, Milan Kapel (after his death the Estate of Milan Kapel and/or **Eleanore** Kapel) and Stephanie Kapel. The Company had an objective to carry on business and divide the gains received therefrom.

**HN4** 26 CFR 301.7701-2(c) states that an organization has centralized management if any person has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed. The facts show that **Eleanore** Builders had centralized management. From [**12] 1954 until his death in 1984, Milan Kapel had continuing exclusive authority to make management decisions.

**HN5** An organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation or expulsion of any member will not cause dissolution of the organization. The President and 20% shareholder of **Eleanore** Builders died in 1984. However, the operations of the Company did not change.

The third characteristic necessary for finding **Eleanore** Builders to be an association is free transferability of interests. 26 CFR 301.7701-2(e) describes this term as follows:

[*1115] **HN6** (1) An organization has the corporate characteristic of free transferability of interests if each of its members or those members owning substantially all of the interests in the organization have the power, without the consent of the other members, to substitute for themselves in the same organization a person who is not a member of the organization. . . .

In this case, there are no restrictions upon the transferability of the shareholders' interests in the Corporation Shares of the Company's stock were freely transferred throughout the life of the Company. Her cancellation of the corporate charter [**13] and after Milan Kapel's death, Kapel's interest in the Company was freely transferred to his estate and then to **Eleanore** Kapel.

Limited liability, the final criteria for determining whether a corporation exists for federal tax purposes occurs where

HN7 (1) An organization has the characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization. Personal liability means that a creditor of an organization may seek personal satisfaction from a member of the organization to the extent that the assets of such organization are insufficient to satisfy the creditor's claim. * * *
26 CFR § 301,6601-2(d).

HN8 In **Ohio** a corporation whose charter is terminated for failure to pay franchise taxes continues to be a corporation. _Eversman v. Ray Shipman Co., 115_ **Ohio** _St. 269, 152 N.E. 643 (1926)_. It has been further held that a shareholder of such corporation still has limited liability. _Columbia Real Estate Title Insurance Co. v. Columbia Title Agency, Inc., 11_ **Ohio** _App. 3d 284, 465 N.E.2d 468 (1983)_. _Monteith v. Kline, 1992_ **Ohio** _App. LEXIS 3283, 1992 WL 150281_ (**Ohio** App [**14] 1992); _Carlin & Carlin v. Exec-U-Type, Inc._ 1987 WL 5648 (**Ohio** App 1987). Thus, the shareholders of **Eleanore** Builders were not liable for transactions made on behalf of the Company. **Eleanore** Kapel signed agreements to sell Company property as "President" of the Company and checks were signed that indicated **Eleanore** Builders was a corporation. Therefore, the limited liability requirement is satisfied. The conclusion is that **Eleanore** Builders remained a corporation for federal tax purposes after its charter was revoked by the **Ohio** Department of Taxation.

Accordingly, the Plaintiff's motion for summary judgment is denied. The defendant's motion for summary judgment is granted. Judgment is for the defendant.

IT IS SO ORDERED.

George W. White

UNITED STATES DISTRICT JUDGE

_ORDER_

Pursuant to this Court's Memorandum and Order filed contemporaneously with this Order,

IT IS ORDERED that plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Judgment is for the defendant.

IT IS SO ORDERED.

George W. White

United States District Judge

# EXHIBIT "K"

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**

In re:                                                    §

NU-TRAX, INC.                                    §          CASE NO: 87-45667
                                                              §
          **DEBTOR**                                §
                                                              §
_____/

U.S. BANKRUPTCY COURT
E.D. MICHIGAN-DETROIT
2007 NOV 27 PM 3: 08

### ORDER FOR PAYMENT OF UNCLAIMED FUNDS

Upon application, and in accordance with the provisions of 28 U.S.C., Section 2042, tha

following a review of the sufficiency of the application of claimant under the provisions of 28

U.S.C. 1746, and the U.S. Attorney for the Eastern District of Michigan was provided with a

copy of this application with a proof of service attached to the application,

**AND** it appears from the application and supporting documentation that Claimant is

entitled to the funds paid into Court.

Therefore, IT IS ORDERED that the Clerk is directed to remit one check in the amoun

of $86,939.07 from funds held in the U.S. Treasury made payable to Nu-Trax, Inc. c/o Omega

Consulting at 7706 Pinebrook Drive; San Antonio, Tx 78230.

DONE AND ORDERED THIS _____ DAY OF 20_____.

_____
UNITED STATES BANKRUPTCY JUDGE   NOV 2 7 2007

12/17/2007 2:28 PM

# EXHIBIT "L"

UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Lido Beach Inn Condo Hotel                      8:95-bk-07562-ALP
Association, Inc.,

    Debtor.

AMENDED
ORDER GRANTING PETITION FOR PAYMENT OF
UNCLAIMED FUNDS TO DEBTOR (sic)

THIS CASE came on for hearing upon the Petition for Payment of Unclaimed Funds to Debtor (sic), which this Court will treat as a motion, filed by Brian Baum, of Baum & Baum, Associates, P.A., as attorneys for the Debtor. The Court having considered the motion and the argument of counsel, finds that more than five (5) years have elapsed since the conformation order of the Debtor's Chapter 11 Plan of Reorganization and that the funds remaining unclaimed and on deposit in the Court's registry account have become property of the debtor pursuant to 11 U.S.C. Sections 347 and 1143. The motion will be granted as to the amount on deposit in the registry account of this debtor on the date of the entry of this order. Accordingly, it is

ORDERED that the Clerk of Court is directed to disburse a check in the amount of $58,291.20, representing the balance in the account of this debtor, to Lido Beach Inn Condo Hotel Association, Inc., c/o Baum and Baum Associates, P.A., 1795 North Fry Road, #214, Katy, Tx 77449.

DONE AND ORDERED on _February 14, 2005._

ALEXANDER L. PASKAY,
United States Bankruptcy Judge

Copies furnished to:

Financial Administrator
Don M. Stichter, Esq.
Baum & Baum Associates, Inc.

# EXHIBIT "M"

UNITED STATES BANKRUPTCY
COURT FOR THE SOUTHERN
DISTRICT OF FLORIDA

In the Matter of

CASE NO. 73-415-BK-CF-H

FIRST BAPTIST CHURCH, INC.,
OF MARGATE, FLORIDA,

and its wholly owned subsidiary,

IN PROCEEDING FOR
REORGANIZATION OF A
CORPORATION UNDER CHAPTER X

C.D.K. CORP., a Florida corporation,

Debtors.

_____/

## ORDER DIRECTING DISTRIBUTION OF UNCLAIMED
## FUNDS IN THE REGISTRY OF THE BANKRUPTCY COURT

THIS CAUSE came for hearing on the 24th day of October, 2001, on the motion of First

Baptist Church, Inc. of Margate, Florida (the "Debtor") seeking the return of unclaimed funds on

deposit in the registry of the Bankruptcy Court.

The Debtor is a not-for-profit Florida corporation. The Debtor was dissolved for non-payment

of annual fees

It appears that there are funds in the registry of the Bankruptcy Court in the amount of

$127,386.00 representing uncashed dividend checks. The Debtor claims that pursuant to, inter alia,

§§204 and 205 of the Chapter X Bankruptcy Act of 1898, these funds belong to it, citing, inter alia,

In re Georgian Villa, Inc., 55 F.3D 1561 (11 Cir. 1995) and In re TLI, Inc., 213 B.R. 946 (N.D. Tex.

1997), aff'd 159 F.3d 1355 (5th Cir. 1998).

The Court is advised by Brian Baum of Baum & Baum, Associates, P.A., the Debtor's present

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 01-14084 RGM |
| Ecocom USA Limited, Inc | § | |
| | § | |
| DEBTOR. | § | |

## MOTION FOR THE RECOVERY OF UNCLAIMED FUNDS

COMES NOW Dilks & Knopik, LLC, by and through its Attorney, Tommy Andrews, Jr., Attorney, of Tommy Andrews, Jr., P.C. ("Applicant") hereby petitions the Court for $35,397.70, which is the sum of all monies being held in the US Treasury of this court as unclaimed funds, which are due to New York Broker, Inc., creditor. A dividend check in the amount totaling $35,397.70 was not negotiated by the creditor and the Trustee, pursuant to 11 U.S.C. Section 347(a), delivered the unclaimed funds to the Clerk, US Bankruptcy Court.

The creditor did not receive the dividend check in the above case for the following reason:

The original dividend check was mailed to New York Broker, Inc. c/o Dylan G. Tache, Esq., 7925 Jones Broanch Drive #6200, McLean, VA 22102. That address belonged to the attorney that represented New York Broker, Inc. at the time of the above captioned case, as evidenced by exhibit A. New York Broker, Inc, located in Herndon, VA, is majority owned by German based Incam AG, as evidenced by exhibits B & C. Jöerg Urlaub is the CEO of Incam AG, as evidenced by exhibit C – page 19, and is authorized to sign on behalf of the company.

The claimant's current mailing address, phone and social security/tax identification number are:

New York Broker, Inc.
Jöerg Urlaub CEO
Lange Hecke 75
D-41564 Kaarst Germany
(0 21 31) 40 66 -0

Furthermore, Applicant has no knowledge that this claim has been previously paid or that any party other than the claimant is entitled to these funds.

Dilks & Knopik, LLC has been appointed by New York Broker, Inc., claimant, as its Attorney-in-Fact who is duly authorized by the attached original Power of Attorney and supporting documentation to apply for these funds. Dilks & Knopik, LLC is acting through its Attorney, Tommy Andrews, Jr., Attorney, of Tommy Andrews, Jr., P.C. to recover these funds on behalf of New York Broker, Inc.

Case No.: 73-415-BK-CF-H

counsel, that it has an agreement with the Debtor whereby the sum of $47,954.40 of the gross proceeds be distributed to it on account of its services in filing and prosecuting this motion, including the reinstatement of the corporation. Baum and Baum has also filed with this Court a united power of attorney executed by the Treasurer of First Baptist Chruch, Inc. of Margate, Florida giving Baum & Baum authority to collect these funds for the Debtor.

ORDERED, ADJUDGED and DECREED that the Clerk shall disburse the amount of $127,386.00 from the funds remaining on deposit in the Registry of the Court the following sums: (a) to Buchbinder & Elegant, P.A., 46 S.W. 1st Street, 4th Floor, Miami, Florida 33130, the sum of $5,000; (b) to Baum & Baum, Associates, P.A., 1795 North Fry Rd., #214, Katy, Texas 77449, the sum of $47,954.40 in full settlement and satisfaction of its claim for fees and costs; and (c) to First Baptist Chruch, Inc. of Margate, Florida, c/o Samuel F. Sutter, 749 Wentworth Street, Sebastian, FL 32958-4851, the sum of $74,431.56.

DONE AND ORDERED this 27 day of December, 2001.

A. JAY CRISTOL

_____
A. JAY CRISTOL
United States Bankruptcy Judge

Copies Furnished to:

Brian Baum, Esquire
BAUM & BAUM, ASSOCIATES, P.A.
1795 North Fry Rd., #214
Katy, Texas 77449

E. Philip Green, Esquire
Buchbinder & Elegant, P.A.
46 S.W. 1st Street - 4th Floor
Miami, Fl 33130

United States Attorney
99 N.E. 4th Street
Miami, Fl 33132

Assistant U.S. Trustee
51 S.W. 1st Avenue
Room 1517
Miami, Fl 33130

Applicant now seeks to recover the funds from the Court's Registry. Wherefore, Applicant prays that, upon proper notice to the U.S. Attorney's Office, the Court order that a check in the amount of $35,397.70 made payable to New York Broker, Inc. c/o Tommy Andrews, Jr., P.C. be issued from the Court's Registry.

Dated: 4/25/07               Respectfully Submitted:

                                          _____
                                          Tommy Andrews, Jr., Attorney
                                          Tommy Andrews, Jr., P.C.
                                          122 North Alfred Street
                                          Alexandria, VA 22314
                                          (703) 838-9004


On 4/25/07 before me, Tommy Andrews, Jr., personally appeared, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person (s) whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument. WITNESS my hand and official seal.

[Seal]          Notary Public
                for the State of Virginia City County of Alexandria
                My Commission Expires: 5/31/07


          M. VANESSA BUSTAMANTE
        NOTARY PUBLIC COMMONWEALTH OF VIRGINIA
          My Commission Expires May 31, 2007

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

| IN RE: | § | |
|---|---|---|
| | § | CASE NO. 01-14084 RGM |
| Ecocom USA Limited, Inc | § | |
| | § | |
| DEBTOR | § | |
| | § | |

## CERTIFICATE OF SERVICE

I, Tommy Andrews, Jr., Attorney for Tommy Andrews, Jr., P.C., the undersigned, do declare that on ___4/25/17___, I served the within Motion for the Recovery of Unclaimed Funds to the US Attorney and US Trustee listed below.

I further declare that I served a true and correct copy of the within document via United States Mail, with postage thereon fully prepaid, to the following individual(s) as follows:

U.S. Attorney's Office
2100 Jamieson Avenue
Alexandria, VA 22314

-And-

Office of the United States Trustee
115 South Union Street, Ste 210
Alexandria, VA 22314

I declare, under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: ___4/25/07___          Respectfully Submitted: _____

Tommy Andrews, Jr., Attorney
Tommy Andrews, Jr., P.C.
122 North Alfred Street
Alexandria, VA 22314
(703) 838-9004

On ___4/25/07___ before me, Tommy Andrews, Jr., personally appeared, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person (s) whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or entity upon behalf of which the person acted, executed the instrument. WITNESS my hand and official seal.

Notary Public
for the State of _Virginia_, County of _Alexandria_
My commission expires___5/3.1.07___

[Seal]

M. VANESSA BUSTAMANTE
NOTARY PUBLIC COMMONWEALTH OF VIRGINIA
My Commission Expires May 31, 2007

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA, ALEXANDRIA DIVISION

| | § | |
|---|---|---|
| IN RE: | § | CASE NO. 01-14084 RGM |
| Ecocom USA Limited, Inc | § | |
| | § | |
| DEBTOR. | § | |
| | § | |

### ORDER TO PAY UNCLAIMED FUNDS

It appearing that the check made payable to New York Broker, Inc., in the amount of $35,397.70 was not charged against the bank account of the debtor's estate within the 90-day limit pursuant to 11 U.S.C.§347 and an unclaimed money report was entered to close the account and transfer the monies into the registry of the Clerk, United States Bankruptcy Court, and

It further appearing that a Motion for the Recovery of Unclaimed Funds having been filed pursuant to Local Bankruptcy Rule 3011-1, said motion having been served on the US Trustee and the US Attorney for the Eastern District of Virginia and there being no objections filed, it is further appearing that New York Broker, Inc. now claims the above monies in the petition attached hereto,

IT IS ORDERED that the Clerk of the Bankruptcy Court pay the sum of $35,397.70, to:

New York Broker, Inc.
C/o Tommy Andrews, Jr., P.C.
Attn: Tommy Andrews, Jr.
122 North Alfred Street
Alexandria, VA 22314

Dated: _____

_____
United States Bankruptcy Judge

Application Submitted By:

Dated: _____

_____
Tommy Andrews, Jr., Attorney
Tommy Andrews, Jr., P.C.
122 North Alfred Street
Alexandria, VA 22314
(703) 838-9004

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF VIRGINIA**
____Alexandria____ **Division**

In re  Ecocom Usa Limited, Inc.                    Case No.  01-14084-RGM

                    **Debtor(s)**            **Chapter**  7

**ORDER FOR RETURN OF UNCLAIMED FUNDS**

A Motion for Return of Unclaimed Funds having been filed pursuant to Local Bankruptcy Rule 3011-1, said motion having been served on the United States Trustee and the United States Attorney for the Eastern District of Virginia and there being no objections filed; it is

**ORDERED** that the unclaimed funds in the amount of $_35,397.70_____ . currently on deposit with the Treasury of the United States, be returned to:

New York Broker, Inc.
c/o Tommy Andrews, Jr., P.C.
Attn: Tommy Andrews, Jr.
122 North Alfred Street
Alexandria, VA 22314

Let the Clerk give notice of entry of this order to the debtor(s), attorney for debtor(s), movant, attorney for movant, if applicable,  trustee and United States Trustee.

Date:  _Jun 4 2007_____        _/s/ Robert G. Mayer_____
                          United States Bankruptcy Judge

                          NOTICE OF JUDGMENT OR ORDER
                          ENTERED ON DOCKET:
                          _JUNE 5, 2007_____

pc: Financial Administrator

[ounclmfd ver. 03/06]

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

In re

INTERNATIONAL
ADMINISTRATIVE SERVICES, INC.,          Chapter 11
                                        Case No. 96-03950-6J1

                    Debtor.
_____/

## ORDER GRANTING MOTION FOR PAYMENT
## OF UNCLAIMED FUNDS TO THE DEBTOR AND GRANTING MOTIONS FOR
## PAYMENT OF UNCLAIMED FUNDS TO VARIOUS CLAIMANTS

THIS CASE initially came on for hearing on December 6, 2006, and for a continued hearing on February 7, 2006 (collectively, the "Hearing"), on the Motion of International Administrative Services, Inc. (the "Debtor" or "IAS"), pursuant to 11 U.S.C. §§347(b) and 1143, for entry of an order directing that the unclaimed funds held in the registry account of unclaimed funds be paid to the Debtor (Doc. No. 1038) and the Amended Motion for payment of unclaimed funds to the Debtor (Doc. No. 1039) (collectively, the "IAS Motion").

At the Hearing, in addition to the IAS Motion, the Court considered other Motions for Unclaimed Funds filed by various claimants (Doc. Nos. 1016, 1017, 1018, 1022, 1023, 1028, 1029, 1030, 1031, 1032, 1033, 1034, 1036, 1037, 1045, 1046, 1047, 1048, 1049, 1052, 1053, 1054, 1056, 1057, 1059, 1064, 1071, 1074, 1076, and 1082)(collectively, the "Claimant Motions"). At the Hearing, the Debtor did not object to the Claimant Motions.

Upon consideration of the IAS Motion, the Claimant Motions, and the position of the Debtor and the interested party present at the Hearing, the Court finds that the parties

have furnished all necessary documentation and otherwise have complied with the requirements for release of the unclaimed funds and it is hereby

**ORDERED:**

1.      The IAS Motion is granted. The Clerk of the Court shall pay the unclaimed funds in the amount of $108,702.64 to International Administrative Services, Inc. at the following address: 230 Crown Oak Centre Drive, Longwood, Florida 32750.

2.      The Claimant Motions are granted. The Clerk of the Court shall pay the unclaimed funds in the amounts and to the claimants as set forth in **Exhibit "A"**.

3.      There will be no further distributions from the unclaimed funds.

**DONE AND ORDERED,** at Orlando, Florida, this 14th day of February, 2007.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies to:

Debtor: International Administrative Services, Inc., 230 Crown Oak Centre Drive, Longwood, Florida 32750;

Debtor's Counsel: R. Scott Shuker, Esq., Gronek & Latham, LLP, PO Box 3353, Orlando, FL 32802-3353;

Charlene J. Keys, d/b/a Keys Research, 23630 S.E. 440th Street, Enumclaw, WA 98022;

Larry L. Moses, General Manager, The Financial Resources Group, Inc., 700 Mechem Drive, Suite 8B, Ruidoso, New Mexico 88345;

Brian J. Dilks, Dilks & Knopik, LLC, P.O. Box 2728, Issaquah, WA 98027;

U.S. Attorney, Attn: Civil Procedures Clerk, 400 N. Tampa Street, Ste 3200, Tampa, Florida 33602;

Office of the U.S. Trustee, 135 W. Central Blvd., Ste. 620, Orlando, FL 32801.

Kent T Hickey   1314 Cobbler Lane Allentown PA   18104

Kerri L Perez 33 North Anguilla Rd   N Stonington CT   06359

NuTech Enterprises Inc c/o Ronald Simom 1612 Cape Coral Pkwy   Cape Coral FL 33904

David W and Debra L Moore 17028 3rd PL W   Bothell WA   98012-9191

Patrick Harding
c/o Quest Locators
4255 S Buckley Rd   #281
Aurora CO   80013

**Exhibit "A"**

| Motion | Amount of Unclaimed Funds to be Paid | Claimants name and address where the Clerk of the Court should send the check |
|---|---|---|
| **Motion for Payment of Unclaimed Funds for Robert and Norine Baird (Doc. No. 1016)** | $1,090.11 | **Robert and Norine Baird**<br>12597 Argyle Rd.<br>Hot Springs, SD 57747 |
| **Motion for Payment of Unclaimed Funds for Vicki Phelps (Doc. No. 1017)** | $1,029.31 | **Vicki Phelps**<br>20007 Glen Lake Drive<br>Spring, TX 77388 |
| **Motion for Payment of Unclaimed Funds for Richard Oehler (Doc. No. 1018)** | $1,725.12 | **Richard Oehler**<br>20313 Wayzata Court<br>Pflugerville, TX 78660 |
| **Motion for Payment of Unclaimed Funds for Geovanny Abarca (Doc. No. 1023)** | $785.48 | **Geovanny Abarca**<br>c/o The Financial Resource Group<br>700 Mechem Dr., Ste. 8B<br>Ruidoso, NM 88345 |
| **Motion for Payment of Unclaimed Funds for F. Harrell (Doc. No. 1028)** | $963.02 | **F. Harrell**<br>c/o The Financial Resource Group<br>700 Mechem Dr., Ste. 8B<br>Ruidoso, NM 88345 |
| **Motion for Payment of Unclaimed Funds for Felix Albino (Doc. No. 1029)** | $609.28 | **Felix Albino**<br>13048 Waterford Wood Circle, Apt. 106<br>Orlando, FL 32828-6064 |
| **Motion for Payment of Unclaimed Funds for Robert Williams (Doc. No. 1030)** | $430.53 | **Robert Williams**<br>718 Middle Ave.<br>Wilmerding, PA 15148-1027 |
| **Motion for Payment of Unclaimed Funds for Arthur Ramirez (Doc. No. 1031)** | $691.07 | **Arthur Ramirez**<br>13474 Mohawk Rd., Unit A<br>Apple Valley, CA 92308 |
| **Motion for Payment of Unclaimed Funds for Anthony Gardocki (Doc. No. 1032)** | $628.17 | **Anthony Gardocki**<br>131 Tower Hill Rd., Box 404<br>Brimfield, MA 01010-9619 |
| **Motion for Payment of Unclaimed Funds for Gail Anderson f/k/a Gail Tellez (Doc. No. 1033)** | $604.25 | **Gail Ann Anderson**<br>Attn: Gail Ann Anderson<br>6 W Oaks Court<br>San Antonio, TX 78213-1823 |
| **Motion for Payment of Unclaimed Funds for Lester Bowers (Doc. No. 1034)** | $426.75 | **Lester Bowers**<br>921 S Zeno Way, Unit 108<br>Aurora, CO 80017-2600 |

| | | |
|---|---|---|
| **Motion for Payment of Unclaimed Funds for Donald Daniels** (Doc. No. 1036) | $629.42 | **Donald Daniels** 8500 Kings Ridge Rd. Parkville, MD 21234-4915 |
| **Motion for Payment of Unclaimed Funds for Martha Webb** (Doc. No. 1037) | $546.73 | **Martha Webb** 19056 85th Ave., NE Bothell, WA 98011 |
| **Motion for Payment of Unclaimed Funds for Ray Miller** (Doc. No. 1045) | $446.89 | **Ray Miller** 5106 Louise St. Seabrook, TX 77586-1945 |
| **Motion for Payment of Unclaimed Funds for Craig Elliott** (Doc. No. 1046) | $489.65 | **Craig Elliott** 1450 California Ave. Port Orchard, WA 98366 |
| **Motion for Payment of Unclaimed Funds for Randy Newlin** (Doc. No. 1047) | $540.56 | **Randy Newlin** Attn: Randy L. Newlin 8501 W 16th St., N Wichita, KS 67212-5831 |
| **Motion for Payment of Unclaimed Funds for Simone DeMass** (Doc. No. 1048) | $670.70 | **Simone DeMass** c/o The Financial Resource Group 700 Mechem Dr., Ste. 8B Ruidoso, NM 88345 |
| **Motion for Payment of Unclaimed Funds for Jack Mebus** (Doc. No. 1049) | $751.49 | **Jack Mebus** c/o The Financial Resource Group 700 Mechem Dr., Ste. 8B Ruidoso, NM 88345 |
| **Motion for Payment of Unclaimed Funds for Matthew K. Wong** (Doc. No. 1052) | $963.02 | **Matthew K. Wong** c/o The Financial Resource Group 700 Mechem Dr., Ste. 8B Ruidoso, NM 88345 |
| **Motion for Payment of Unclaimed Funds for Jody L. Crowson, Sr.** (Doc. No. 1053) | $746.25 | **Jody L. Crowson, Sr.** c/o The Financial Resource Group 700 Mechem Dr., Ste. 8B Ruidoso, NM 88345 |
| **Motion for Payment of Unclaimed Funds for Candice Myrum** (Doc. No. 1054) | $5,781.90 | **Candice Myrum** 222 Laurelhurst Tumwater, WA 98501 |
| **Motion for Payment of Unclaimed Funds for Kent T. Hickey** (Doc. No. 1056) | $2,049.15 | **Kent. T. Hickley** 1314 Cobbler Lane Allentown, PA 18104 |
| **Motion for Payment of Unclaimed Funds for Suzanne Smith** (Doc. No. 1057) | $1,538.25 | **Susanne Smith** 11606 Hampstead Dr., Lot 21 Fredericksburg, VA 22407-7418 |
| **Motion for Payment of Unclaimed Funds for Kerri L. Perez** (Doc. No. 1059) | $601.73 | **Kerri L. Perez** 33 North Anguilla Road North Stonington, CT 06359 |

| | | |
|---|---|---|
| Motion for Payment of Unclaimed Funds for Glenn Kakely (Doc. No. 1064) | $451.93 | Glenn Kakely c/o Glenn Kakely 174 S Manning Blvd. Albany, NY 12208-1814 |
| Motion for Payment of Unclaimed Funds for Nutech Enterprises Inc. (Doc. No. 1071) | $19,696.66 | NuTech Enterprises, Inc. c/o Ronald Simon 1612 Cape Coral Parkway Cape Coral, FL 33904 |
| Motion for Payment of Unclaimed Funds for David W. Moore and Debra L. Moore (Doc. No. 1074) | $624.54 | David W. Moore and Debra L. Moore 17028 3rd Place West Bothell, Washington 98012-9191 |
| Motion for Payment of Unclaimed Funds for Larry Lanier Sr. (Doc. No. 1076) | $629.42 | Larry Lanier Sr. P.O. Box 491857 College Park, GA 30349 |
| Motion for Payment of Unclaimed Funds for Patrick Harding (Doc. No. 1082) | $579.07 | Patrick S. Harding 3289 Pepperbridge Rd. Walla Walla, WA 99362 |

# EXHIBIT "O"

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

In re

INTERNATIONAL
ADMINISTRATIVE SERVICES, INC.,                    Chapter 11
                                                  Case No. 96-03950-6J1

                  Debtor.

_____/

ORDER GRANTING MOTION FOR PAYMENT
OF UNCLAIMED FUNDS TO THE DEBTOR AND GRANTING MOTIONS FOR
PAYMENT OF UNCLAIMED FUNDS TO VARIOUS CLAIMANTS

THIS CASE initially came on for hearing on December 6, 2006, and for a

continued hearing on February 7, 2006 (collectively, the "Hearing"), on the Motion of

International Administrative Services, Inc. (the "Debtor" or "IAS"), pursuant to 11

U.S.C. §§347(b) and 1143, for entry of an order directing that the unclaimed funds held

in the registry account of unclaimed funds be paid to the Debtor (Doc. No. 1038) and the

Amended Motion for payment of unclaimed funds to the Debtor (Doc. No. 1039)

(collectively, the "IAS Motion").

At the Hearing, in addition to the IAS Motion, the Court considered other

Motions for Unclaimed Funds filed by various claimants (Doc. Nos. 1016, 1017, 1018,

1022, 1023,1028, 1029, 1030, 1031, 1032, 1033, 1034,1036, 1037, 1045, 1046, 1047,

1048, 1049, 1052, 1053, 1054, 1056, 1057, 1059, 1064, 1071, 1074, 1076, and

1082)(collectively, the "Claimant Motions"). At the Hearing, the Debtor did not object to

the Claimant Motions.

Upon consideration of the IAS Motion, the Claimant Motions, and the position of

the Debtor and the interested party present at the Hearing, the Court finds that the parties

have furnished all necessary documentation and otherwise have complied with the requirements for release of the unclaimed funds and it is hereby

**ORDERED:**

1.    The IAS Motion is granted. The Clerk of the Court shall pay the unclaimed funds in the amount of $108,702.64 to International Administrative Services, Inc. at the following address: 230 Crown Oak Centre Drive, Longwood, Florida 32750.

2.    The Claimant Motions are granted. The Clerk of the Court shall pay the unclaimed funds in the amounts and to the claimants as set forth in **Exhibit "A"**.

3.    There will be no further distributions from the unclaimed funds.

**DONE AND ORDERED,** at Orlando, Florida, this 14th day of February, 2007.

KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies to:

Debtor: International Administrative Services, Inc., 230 Crown Oak Centre Drive, Longwood, Florida 32750;

Debtor's Counsel: R. Scott Shuker, Esq., Gronek & Latham, LLP, PO Box 3353, Orlando, FL 32802-3353;

Charlene J. Keys, d/b/a Keys Research, 23630 S.E. 440th Street, Enumclaw, WA 98022;

# UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

In re:

**LEE WAY HOLDING COMPANY**

§
§
§
§
§

**CASE NO: 85-00661**

**DEBTOR**

_____/

1. This matter comes before the Court upon the motion of Applicant, <u>Omega Consulting</u>, in its capacity as Assignee of Lee Way Holding Company, seeking an entry of an order authorizing payment of unclaimed bankruptcy dividend(s).

2. It appearing to the Court that said Applicant is entitled to receive payment of the unclaimed dividend(s), and that said funds are now on deposit in the Registry of the Court or the United States Treasury , it is ORDERED that the clerk of the Court pay $_____ to the order of:

> Lee Way Holding Company
> c/o Omega Consulting
>
> and mail payment to:
>
> Omega Consulting
> 7706 Pinebrook Dr
> San Antonio, TX 78230

Date:_____

_____
PRESIDING JUDGE